# Henry William Meyer v. State

No. 26,887. May 19, 1954
Rehearing Denied October 27, 1954
Appellant's Second Motion for Rehearing Denied
(Without Written Opinion) November 24, 1954

*Russell F. Wolters* and *Marshall T. McCullough,* Houston, for appellant.

*Ewing Werlein,* District Attorney, *King C. Haynie,* Assistant District Attorney, Houston, and *Wesley Dice,* State's Attorney, Austin, for the state.

GRAVES, Presiding Judge.

The conviction is for the murder with malice of Elsie Yearwood by shooting her with a gun; the penalty assessed is death.

The killing occurred on June 12, 1953, and the case was called for trial on October 5, 1953, at which time both parties announced ready for trial and the issues were joined.

The facts show that appellant and his wife, Emma Meyer, had been married for 43 years; that they had separated March 10, 1953, and were not living together at the time of the homicide. They had lived for many years on a farm north of Ganado, in Jackson County, Texas. On June 8, 1953, Mrs. Meyer filed a petition for a divorce at Edna, the county seat of said county, and this divorce was granted on August 20, 1953, which was after this offense occurred. Mrs. Meyer and her husband had six children: five girls and one boy. It seems that after Mrs. Meyer left home, she went to live with her daughters, living a part of the time with each one of them. On June 12, 1953, after appellant had been served with the divorce papers, he made up his mind that he was mistreated relative to the requested division of the property, it not having been divided on that date. It was claimed by the appellant that the division of the property seemed so unfair that his mind went out of control.

Dora Schultz, his daughter, lived in Houston, and Elsie Yearwood, another daughter, lived at Edna, in Jackson County. On the night before the tragedy, appellant went to the home of Elsie Yearwood and found that neither she nor his wife were there. He then went to Houston to the home of Dora Schultz, parking his car about a block away from the home and finally entering a building on the Schultz premises. He stayed there until approximately daylight. In the early morning of the

day of the tragedy, Mrs. Schultz' husband saw the appellant with a pistol in his hand, proceeding towards the back door of the Schultz house. The back door was part glass and Dora Schultz, upon seeing the appellant thus approaching, hastily closed the door and latched it. Appellant took his pistol, broke the glass out of the door and crawled through it, thus bringing him into a room of the house. He then proceeded to another door where his wife was concealed in the closet thereof. His daughter, Dora, closed this door and held it until he fired at the lock which caused her to turn it loose. He went into the second room and failing to find his wife or Elsie therein, he proceeded to a further door in another room which was closed and held against him at that time. He also shot off the lock of that door and it was opened. His daughter, Elsie, was standing there and looking at him. He shot her twice through the chest, either shot being fatal, and all she said was "he got me."

Appellant's Bill of Exception No. 1 objects to the fact that Charley Schultz, in whose home this killing occurred, testified that he heard the two infant children of the deceased crying, "Mama, mama," and then heard the appellant mock them by saying, "Mama, mama, just like the kids were crying." This was objected to because these remarks were alleged to be improper and inflammatory. We think they were res gestae of the transaction. Appellant was then doing all he could by means of his pistol to shoot open the doors in order to get to the place where he could kill his daughter. The testimony is patent that Elsie Yearwood, her husband and her two infant children were spending the night with her sister, Dora Schultz, and that these two children were present at the scene of the tragedy. It is true that no one but Charley Schultz testified to these cries, of the children and to the appellant's reaction thereto, but that would not mean that these facts were not admissible as a part of the transaction itself. We see no error in this bill.

Bill of Exception No. 3 relates to the following questions propounded to Dora Schultz by the appellant's attorney and her answers thereto:

"Q.  You wanted your mother to get a divorce, didn't you? A.  Well, that was up to her.

"Q.  What were your feelings about it? A.  Well, I couldn't live with a man that had been beating on me all my life."

These questions were brought out by the appellant and the testimony elicited from the appellant himself shows that he

struck this woman with his hand, while other testimony shows that he struck her with a chair. According to the testimony, other mistreatments seem to have gone on through the years.

Bill No. 4 is an objection to a question asked of Frances Jean Schultz, the child of Dora Schultz, as to what she heard someone say at the shooting and her answer, "Yes, sir, I heard Aunt Elsie say, 'He got me.' " We think this matter was admissible.

Bills of Exception Nos. 5 to 14 inclusive, have been grouped and briefed together, the main complaint being because of the introduction of the divorce between the appellant and his wife, Emma, and the further fact that the court permitted the divorced wife to testify for the state. As to whether this testimony was admissible at the time it was placed therein is not necessary to pass upon, because when the appellant took the stand, the only defense that he offered of any kind was that when this divorce proceeding was instituted and the copy of the plaintiff's petition was served upon him, the more he thought about it the more convinced he was that he was being kicked out in the road and left nothing as a result of his life's labors, and that at the time of the killing he "had to do" what he did. It is worthy of note herein that the wife testified to no facts relative to the actual killing, but merely to matters that were set forth in her petition for a divorce from the appellant. She testified to no material matters that took place at the scene of the killing, it being shown that she had been hidden in the closet by her daughter, Dora, and was not in the room where the killing occurred. We see no error in these bills. See Curd v. State, 86 Texas Cr. R. 552, 217 S.W. 1043; Calloway v. State, 137 Texas Cr. R. 405, 129 S.W. (2d) 646; Ex parte Fatheree, 34 Texas Cr. R. 594, 31 S.W. 403; White v. State, 40 Texas Cr. R. 366, 50 S.W. 705.

It seems that during the time that appellant was shooting into the doors of this house, Mrs. Dora Schultz possessed herself of a baseball bat and was queried about the same while she was on the stand. As she left the stand, Carlos Yearwood, the husband of the deceased, heard Mrs. Dora Schultz make some remark relative to her testimony which had just previously been given. Appellant then asked that Carlos Yearwood not be allowed to take the stand because "he had been forewarned and indirectly advised as to what to expect when he went on the stand." We see no reason why this witness should have been excluded from taking the stand since it was not shown in any way that he had anything to do with such statement, nor that

he ever mentioned anything relative to the fact that Mrs. Dora Schultz had possessed herself of a baseball bat during the time her father was shooting his way into this house.

Bill of Exception No. 18 is concerned with the action of the appellant's attorney in asking one of the arresting officers, C. S. Ponder, the following question:

"Q. And when you returned to Houston with the defendant, going to the city jail with him, you *though* (thought) he was a crazy man, didn't you?"

The state objected to this question as to what the witness thought, and the objection was sustained. It is worthy of note that no request was made of the trial court to charge the jury on the question of lunacy, and no objection was made to the trial court's charge because it failed to incorporate therein any proposition relative to the appellant's sanity at the time he committed this act. The court did charge upon an accidental killing and aggravated assault, as well as murder with malice and murder without malice, and we find no objection of any kind to the court's charge. Appellant had three learned attorneys who carefully and prudently tried this case, and yet they made no request of any kind that the court embody in his charge an instruction relative to the insanity of the appellant at the time of the killing. We see no reasonable ground to say that the opinion of this witness, whether it was good or bad, should have been allowed to be placed before the jury as to the appellant being a crazy man. There is testimony to the effect that after the killing the appellant went off for a block or so, got in his car, put his pistol under him, and laid down on the front seat; that soon thereafter the officers arrived and ordered him to get out of the car. He got out of it and told them to shoot him; that upon being placed in jail a witness, being fearful that appellant might attempt to commit suicide, put him in a padded cell where he would not be able to take his own life at the time. There is no testimony of any kind relative to the appellant's insane condition. Furthermore, the bill itself is incomplete in that it does not show what the witness' testimony would have been.

Bill of Exception No. 21 relates to the further fact that Officer White stated that he put the appellant in a padded cell because he was afraid that he was going to commit suicide. Appellant's attorney asked the witness why he was thus afraid. The state objected to the question and the objection was sustained. It is not further shown what the witness White would

have answered had he been permitted to do so, and we think the reason for such act was not admissible.

Bills Nos. 22, 23 and 24 do not show what appellant was attempting to introduce, nor what his purpose was in asking what seems to be questions relative to immaterial matters.

Bill No. 25 evidences no error, it merely being an effort to get appellant to identify the pistol which he eventually identified as being his and the one used in the killing.

Bills Nos. 28 and 29 relate to the testimony of the appellant in which it was shown that he made certain remarks to his daughter, Elsie Yearwood, some weeks before the killing, as follows: "Elsie, you are going to cause Carlos a lot of grief and trouble." Appellant contends that this was some ten weeks prior to the time of the killing and therefore could not be construed as a threat. We do not agree with that contention.

Bill No. 31 seems to be directed at the fact that there was a further pistol found in the appellant's car besides the one with which he killed his daughter. We think the same would be admissible to show his preparation, at least, for the purpose of killing somebody which eventuated in the fact that he killed his daughter.

Bill No. 35 complains because of the cross-examination of the appellant relative to when he struck his wife, Emma, that she left his home and afterwards filed suit for a divorce, the state's contention being that he struck her over the head with a chair and appellant contending that he slapped her with his fist. We cannot see any serious matter set forth in this cross-examination.

Bill of Exception No. 38 relates to the action of the state in asking the witness, Lewis Watson, Sheriff of Jackson County, as to whether or not he was present at the time of the alleged conversation between appellant and Mrs. Elsie Yearwood, Mrs. Pete Huseman, and Mrs. Mashek, his daughters, in the presence of the appellant. Appellant was shown at that time to have stated to Elsie Yearwood, "Elsie, you are going to cause Carlos lots of grief and trouble." This conversation took place between April 10th and 24th, and prior to this killing. We think this was admissible in order to show the condition of the appellant's mind at the time relative to his daughter and her actions which seem to have finally led to the loss of her life.

The record in this case contains 38 bills of exception. Appellant's counsel have carefully briefed the same, and we have read the brief as well as the facts herein, and we see no serious error committed throughout this difficult trial.

Unquestionably appellant took the life of his own daughter, making the statement that "he had to." He may have been attempting to take the life of his wife also, but he does not say so in his testimony. We only know the testimony, and we can only arrive at our conclusions from his actions at that time.

The jury saw fit to give appellant the death penalty, and we see no reason why this court should reverse this cause, which has been carefully tried by a prudent and cautious judge.

The judgment of the trial court is affirmed.

### ON APPELLANT'S MOTION FOR REHEARING

DAVIDSON, Judge.

By motion for rehearing supplemented by able oral presentation, appellant challenges the correctness of our original conclusion in this case. In deference thereto and because of the further fact that this is a death penalty case, we have again reviewed the entire record.

Regarding the complaint as to permitting the divorced wife of the appellant to testify as to matters arising at the time of the killing, as also the events leading up to the divorce, we note these additional matters:

The record reflects that appellant introduced in evidence the original supplemental and amended petitions of the wife filed in the divorce proceeding. These petitions allege the commission by appellant of the assault upon his then-wife.

It is further noted that while the divorced wife was testifying as a witness for the state, appellant proved by her the assault charged in the petitions.

Appellant is not in position, therefore, to object to proof of these acts which occurred during the existence of the marriage relationship, having, himself, made proof thereof.

We remain convinced that a correct conclusion was reached originally.

Appellant's motion for rehearing is overruled.

Opinion approved by the court.