Joseph Weldon **ROBERTS**, Appellant,

v.

**STATE of Alaska, Appellee.**

**No. 934.**

Supreme Court of Alaska.

May 5, 1969.

Warren A. Tucker, Anchorage, for appellant.

Douglas B. Baily, Dist. Atty., Anchorage, Leroy J. Barker, Asst. Dist. Atty., for appellee.

Before NESBETT, C. J., and DIMOND and RABINOWITZ, JJ.

## OPINION

RABINOWITZ, Justice.

The central issue in this appeal concerns the trial court's denial of appellant's motion to suppress certain evidence which was allegedly obtained in violation of both section 605 of the Federal Communications Act[1] and Alaska's wiretap and eavesdropping statutes.[2] We sustain the lower court's denial of appellant's motion to suppress.

At the suppression hearing which was held prior to trial, the following pertinent evidence was developed:

Mrs. Nema Marine lived with her husband and family on Turnagain Boulevard in Anchorage, Alaska since August 1966. In September of that year the Marines requested, paid for, and were furnished a private telephone by the municipal utilities system of the city of Anchorage. Shortly after Christmas the Marines "began getting little dings on their phone. They were not full rings." At this time the Marines did not do anything about these partial rings.[3] Shortly after Mrs. Marine's husband left for work on January 5, 1967, the telephone began its attenuated ringing once again. Mrs. Marine testified that she

> just stepped to the phone to ascertain if there was another party on that other line and found that there was. And knowing that my husband would be terribly mad because as I said here before he will not condone a party line. Ah, if I went to the telephone company I had

to make sure and I stumbled into this conversation.

According to Mrs. Marine, the conversation she "stumbled" upon consisted of the following. She heard a speaker state:

> 'I have done it now. I have been shot. I need somewhere to rest awhile. I have been treated by a doctor who is a personal friend of mine. The doctor felt as if he owed that favor to me.' So the second party said, ah, 'How bad?' And, ah, so the one who was being called said, ah, 'Pretty bad. I must go somewhere and rest for awhile. Don't tell my wife or anybody else.' So, then the, ah, one who was being called says, 'Well, hang up and I'll call you back in a few minutes.' And that was the initial conversation.

Mrs. Marine testified that this conversation lasted 10 minutes. When asked if she listened for 10 minutes, she replied, "After I heard what I heard the first time, yes, I couldn't do anything else but listen."

At the conclusion of the telephone conversation, Mrs. Marine immediately called her husband to ask what she should do. Upon being told she had "no other choice but to report it," Mrs. Marine called the Alaska State Police and was referred to Sergeant Dankworth to whom she related the information.[4]

Officer Dankworth testified that after receiving the Marine call he checked with the telephone company and ascertained that the Marines did have a private line but sometime late in December of 1966, "The

---

1. 47 U.S.C. § 605 (1934).

2. AS 11.60.280–300.

3. In Mrs. Marine's words, "We let it go unnoticed." Mrs. Marine also testified that during this same period of time
   > our oldest son did pick up the phone one night because he was doing some painting and he was quite frustrated and getting him worried, nervous. So, he told me, he said, 'Mother,' he said, 'Somebody is on our line.' And I said, 'That can't be. It's a private line.' So, I felt like, and my husband felt as you cannot go to the telephone com-

   > pany or to anybody else and make a complaint on what a child has said. So, I had not picked up the telephone prior to January the 5th because the children were at home.

4. Sergeant Dankworth was in charge of the investigation of the killing of Cecil Colvin. Subsequently, a first degree indictment was returned against appellant for the January 4, 1967, slaying of Cecil Colvin. After trial by jury, appellant was found guilty of second degree murder and sentenced to life imprisonment.

telephone company had hooked another party into her line and had not advised her of it." Dankworth also testified that with the assistance of the telephone company he also ascertained "where one of the ends of this telephone conversation was." On cross-examination of Officer Dankworth, the following occurred:

Q Uh, you received as a result of any except the telephone con—first telephone conversation that Mrs. Marine reported to you, did you receive any investigating leads or information?

A No.

Q All the information you have related here today you received and—and worked into other information which was out of the first telephone conversation that she reported to you, is that correct?

A That's correct. The first call when she called me.

The latter portion of Officer Dankworth's testimony is of particular significance because it was also developed at the suppression hearing that the Marines were encouraged by the police to listen to any further conversations which occurred on their telephone line in conjunction with these less-than-full rings.[5] For a few days thereafter the Marines did attempt to overhear any conversations which might take place following "the little rings."

On the basis of the foregoing, the superior court twice denied appellant's motion to suppress all evidence which was obtained as a result of the Marines' purportedly unlawful interceptions.[6] The controlling facts in the case at bar raise first impression issues under section 605 of the Federal Communications Act and Alaska's statutes which prohibit both wiretapping and eavesdropping.[7] Turning first to the question of whether under Alaska's laws the evidence in question should have been suppressed, the applicable statutory provisions read as follows:

Sec. 11.60.280. *Unauthorized publication or use of communications*

\* \* \* \* \* \*

(b) It is unlawful for a person not authorized by a party to the communication to intentionally intercept a communication or to divulge or publish the existence, contents, substance, purport, effect, or meaning of the intercepted communication to any person.

(c) It is unlawful for a person who is not entitled to a communication but who has received the communication to use the communication or any information contained in it for his own or another's benefit.

(d) It is unlawful for a person who has received a communication and who knows or reasonably should know that the communication and the information contained in it was obtained in violation of this section to divulge or publish the existence, contents, substance, purport, effect, or meaning of the communication or any part of the communication.

(e) It is unlawful for a person who has become acquainted with a communication or the information contained in it, and who is not entitled to the communication, to use the same for his own or anothers' benefit, or to divulge or publish the existence, contents, substance, purport, effect, or meaning of the communication or any part of the communication.

---

5. The police even furnished the Marines with a tape recorder and explained the method by which a telephone conversation could be recorded on the furnished equipment.

6. The original indictment against appellant was dismissed. *See* Roberts v. State, 445 P.2d 674 (Alaska 1968).

Prior to the dismissal of the original indictment, Superior Court Judge Ralph Moody denied appellant's motion to suppress. Following appellant's reindictment for the crime of first degree murder, Superior Court Judge Eben H. Lewis denied appellant's suppression motion.

7. *See* AS 11.60.280 and AS 11.60.290.

Also pertinent here is AS 11.60.300 which reads as follows:

> *Exemptions.* The following activities are exempt from the provisions of §§ 280 and 290 of this chapter * * *
>
> * * * * * *
>
> (5) inadvertant [sic] interception of telephone conversations over party lines.

Unlike the usual situation in regard to legislation, here we do have the assistance of a report of the House Judiciary Committee concerning our wiretap and eavesdropping laws.[8] The committee's report contains the following general statements:

> Under the federal act [§ 605 of the Federal Communications Act], in order to obtain a conviction, both interception and divulgence must be proved. This facet of the federal act has been extensively criticized by the U.S. Attorney General's office. Also, it is not clear under the federal act whether an innocent interception is a crime and the federal courts have split on the question. Section 280 of HB 353 avoids those problems.

In regard to AS 11.60.280(b) which prohibits the intentional interception or divulgence of a communication, the committee's report reads as follows:

> Section 280(b) deals with the initial acquisition of a message by persons through the interception of the message at any time. The section contemplates an intentional interception. It should be noted that under this section, the interception alone constitutes a prohibited activity. There is no need to prove interception *and* divulgence, although the latter activity is also prohibited by this section.

Two other portions of the judiciary committee's report are of significance here. First, in regard to the inadvertent interception for party lines, the committee's report states:

> [AS 11.60.300] * * * simply lists the activities which are not to be considered criminal under the provisions of the statute and is self-explanatory.

Secondly, the committee's report also states that:

> In regard to evidence obtained by wiretap or other eavesdropping devices being used in court proceedings, the bill does not in any way change the existing law of Alaska. The admittance or rejection of such evidence is left to case law and the rules governing the admissibility of evidence as interpreted by the court.

Study of this legislative history, together with the text of AS 11.60.280(b)–(e) and AS 11.60.300(5), and the record of the suppression hearing has convinced us of the correctness of the superior court's denials of appellant's motions to suppress. We believe that the suppression hearing evidence affords a reasonable basis for the conclusion that Mrs. Marine's interception of the telephone conversation on the morning of January 5, 1967, was in fact an "inadvertent interception of telephone conversations over party lines" and was therefore removed from the reach of AS 11.60.280's prohibitions. We are of the further view that neither Mrs. Marine's subsequent divulgence to the police of the contents of this conversation nor the use of, and divulgence by the police of, the contents of this conversation constituted violations of AS 11.60.280. For here the record shows that the Marines had ordered and paid for a private telephone and that for a period of four months they did, in fact, receive the benefit of private telephone service. The record further shows that shortly before January 5, the utility company, without notice to the Marines, had hooked another party onto their line. It is also clear from the record that prior to the morning in question the Marines had no knowledge that their telephone line had been changed to a party line, or that Mrs. Marine had ever intentionally intercepted any communication after hearing "little dings" on her telephone. Nor is there any indication that the police had any knowledge of or in any way

---

8. *See* 1966 Alaska House Journal 525–29.

assisted or cooperated with Mrs. Marine in this initial interception. Considering the substance of the conversation, we do not view her failure to immediately hang up as changing the character of the interception in question from that of an "inadvertent interception." Since we are of the opinion that neither Mrs. Marine nor the police violated any provision of AS 11.60.280 under the particular circumstances of this record, we conclude that the trial court correctly denied appellant's motion to suppress insofar as they were based upon alleged violations of AS 11.60.280.

As we have previously mentioned, the House Judiciary Committee's report stated, in regard to evidence obtained in violation of AS 11.60.280, or AS 11.60.290, that, "The admittance or rejection of such evidence is left to case law and the rules governing the admissibility of evidence as interpreted by the court." Assuming that in an appropriate future case this court will fashion an exclusionary rule as a further deterrent to police violations of the provisions of either AS 11.60.280 or AS 11.60.290, and assuming that Mrs. Marine's conduct or that of the police constituted violations of one or more subsections of AS 11.60.290, we are of the view that such conduct should not be included within the ambit of any exclusionary rule.[9] For here we have a situation in which a private citizen, acting in good faith and on her own initiative, without any prior solicitation, assistance, knowledge, connivance, or cooperation from law enforcement authorities, effectuated an "inadver-

tent interception of a telephone conversation over party lines." Admittedly, we would be faced with a significantly altered situation if the suppression hearing disclosed that the police had obtained evidence from, or as a result of, any of the subsequent interceptions which they had both encouraged and attempted to assist the Marines in undertaking.

Positing the necessity for the adoption of an exclusionary rule to insure adherence by law enforcement authorities to our legislative prohibitions against eavesdropping and wiretapping, we remain unconvinced of the need to include, within the ambit of such an exclusionary rule, unintentional interceptions on the part of a private citizen. To do so would stultify the obligation of our citizenry to cooperate with law enforcement authorities in the detection and prevention of criminal conduct. To discourage the use by law enforcement authorities of information brought to their attention in circumstances similar to those under which Mrs. Marine first notified Officer Dankworth would not further any discernible policy behind a rational exclusionary rule. On the basis of this alternative ground, we are thus led to the conclusion that the trial court properly refused to grant appellant's motions to suppress which were bottomed upon asserted violations of Alaska law.

■ We now turn to appellant's contentions concerning section 605 of the Federal Communications Act.[10] It is settled law

---

9. In regard to both AS 11.60.280 and AS 11.60.290, the committee's report states: Neither section 290 or section 300 (the exception section) makes any exception for law enforcement officers. A law enforcement officer is subject to the same penalties as a private citizen who violated the provisions of the bill.

10. The full text of 47 U.S.C. § 605 (1934) at the times in question read as follows:
    *Unauthorized publication or use of communications*
    No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall

divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, or to a person employed or authorized to forward such communication to its destination, or to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, or to the master of a ship under whom he is serving, or in response to a subpoena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being

that this act applies to intrastate telephone calls.[11] In its pertinent portions, section 605 reads:

[N]o person not being authorized by the sender shall intercept any communication and divulge * * * the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *.

Section 501 of 47 U.S.C. makes a willful and knowing violation of section 605 a criminal offense. Fuller v. State [12] offered the first occasion upon which this court was presented with a section 605 issue. There a majority of this court held in part that:

Although this statute makes no reference to admissibility of evidence, it has been construed 'to render inadmissible in a court of the United States communications intercepted and sought to be divulged in violation thereof * * *.' [13] But this does not mean that the statute makes such communications inadmissible in a state court. In Schwartz v. Texas the United States Supreme Court held that section 605 of the Federal Communi-

cations Act 'applies only to the exclusion in federal court proceedings of evidence obtained and sought to be divulged in violation thereof; it does not exclude such evidence in state court proceedings.' [14] Since the federal statute has no effect on state court proceedings, appellant's contention that the telegram was inadmissible because of the statute has no merit, and it is therefore unnecessary for us to decide whether the telegram was in fact obtained in violation of the federal statute. Other state courts have reached similar results.

Subsequent to our decision in Fuller v. State,[15] the Supreme Court of the United States overruled Schwartz v. Texas[16] in Lee v. Florida.[17] There the Supreme Court held that the federal exclusionary rule pertaining to evidence obtained and sought to be divulged in violation of section 605 was mandatory in state court proceedings. In writing for the majority, Mr. Justice Stewart said:

But the decision we reach today is not based upon language and doctrinal symmetry alone. It is buttressed as well by the 'imperative of judicial integrity.'

authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto; and no person having received such intercepted communication or having become acquainted with the contents, substance, purport, effect, or meaning of the same or any part thereof, knowing that such information was so obtained, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of the same or any part thereof, or use the same or any information therein contained for his own benefit or for the benefit of another not entitled thereto: *Provided*, That this section shall not apply to the receiving, divulging, publishing, or utilizing the contents of any radio communication broadcast, or transmitted by amateurs

or others for the use of the general public, or relating to ships in distress. June 19, 1934, c. 652, Title VI, § 605, 48 Stat. 1103.

11. Weiss v. United States, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298 (1939).

12. 437 P.2d 772, 774 (Alaska 1968).

13. Schwartz v. Texas, 344 U.S. 199, 201, 73 S.Ct. 232, 97 L.Ed. 231, 234 (1952), citing Nardone v. United States, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937).

14. The doctrine of this case was reaffirmed in Pugach v. Dollinger, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678 (1961). See also Benanti v. United States, 355 U.S. 96, 101, 78 S.Ct. 155, 2 L.Ed.2d 126, 131 (1957).

15. 437 P.2d 772 (Alaska 1968), aff'd on other grounds, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968).

16. 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231 (1952).

17. 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed. 2d 1166 (1968).

Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669, 1680. Under our Constitution no court, state or federal, may serve as an accomplice in the willful transgression of 'the laws of the United States,' laws by which 'the Judges in every State [are] bound  *  *  *.' [18]

Finally, our decision today is counseled by experience. The hope was expressed in Schwartz v. Texas that '[e]nforcement of the statutory prohibition in § 605 can be achieved under the penal provisions' of the Communications Act. 344 U.S., at 201, 73 S.Ct. at 234, 97 L.Ed. at 235. That has proved to be a vain hope. Research has failed to uncover a single reported prosecution of a law enforcement officer for violation of § 605 since the statute was enacted. We conclude, as we concluded in Elkins and in Mapp, (Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081) that nothing short of mandatory exclusion of the illegal evidence will compel respect for the federal law 'in the only effectively available way—by removing the incentive to disregard it.' Elkins v. United States, 364 U.S., at 217, 80 S.Ct. at 1444, 4 L.Ed. 2d at 1677.

Following rendition of its decision in Lee v. Florida,[19] the Supreme Court of the United States held in Fuller v. Alaska [20] that

the exclusionary rule of Lee is to be given prospective application  *  *  *.

 *  *  *  [and] is to be applied only to trials in which the evidence is sought to be introduced after the date of our decision in Lee.

■ The date of the Supreme Court's decision in the Lee case is June 17, 1968, which is subsequent to appellant's trial in the·case at bar. Appellant's assertions regarding evidence violative of section 605

of the Federal Communications Act can thus be disposed of on the ground that the mandatory exclusionary rule of Lee has no applicability here since Fuller v. Alaska [21] determined that Lee would be applied only prospectively. In such circumstances this court's decision in Fuller v. State [22] is controlling and whether or not Mrs. Marine, or the police, violated any provisions of section 605 of the Federal Communications Act bears no relevance to the admissibility of any evidence obtained in violation of this statute.

An additional reason for our conclusion that appellant's suppression contentions relating to section 605 of the federal act were properly rejected below is our belief that Mrs. Marine's conduct was not violative of the act. Granted Mrs. Marine's initial listening in on the morning conversation of January 5, 1967, constituted an interception within the meaning of the federal act, what is lacking here is a "willful" or "knowing" violation of section 605 on her part. We do not believe that any federal precedent requires the conclusion that Mrs. Marine committed a willful or knowing interception or used the information she obtained for her own use or for the benefit of another. Nor does federal precedent indicate that the law enforcement authorities' use and divulgence of the information furnished to them by Mrs. Marine violated the last clause of section 605.[23]

■ In addition to the foregoing, we are persuaded that the Congress of the United States never intended to prohibit disclosure to law enforcement authorities in the case where a private citizen, such as Mrs. Marine, on her own initiative without any suggestions of police direction, coercion, or assistance, inadvertently overheard a

18. Id. 392 U.S. at 385–387 at 1172–1173, 88 S.Ct. at 2100–2101 (footnotes omitted).

19. 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed. 2d 1166 (1968).

20. '393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212, 213–214 (1968).

21. Id.

22. 437 P.2d 772 (Alaska 1968).

23. Pugach v. Klein, 193 F.Supp. 630 (S. D.N.Y.1961), aff'd on other grounds, Pugach v. Dollinger, 365 U.S. 458, 81 S. Ct. 650, 5 L.Ed.2d 678 (1961); United States v. Lewis, 87 F.Supp. 970 (D.D.C. 1950).

conversation over what was believed by her to be a private line. We are not unaware that Lee v. Florida [24] involved a party line interception. There the state argued that "the police cannot be deemed to have 'intercepted' the telephone conversations, because people who use party lines should realize that their conversations might be overheard." In answer to this contention, the court stated:

> This is not a case, however, where the police merely picked up the receiver on an ordinary party line, and we need not decide whether § 605 would be applicable in those circumstances. For here the police did much more. They deliberately arranged to have a telephone connected to Lee's line without his knowledge and they altered that connection in such a way as to permit continuous surreptitious surveillance and recording of all conversations on the line. [25]

The case at bar is factually distinguishable from *Lee*. Here we have no record of continuous surreptitious surveillance by the police. What the record does show is that a private citizen merely picked up her own receiver on what she had previously believed to be her own private line. Factually, this is quite removed from the type of conduct condemned in the *Lee* case. All of which brings us to our final reason for sustaining the suppression rules of the trial court.

On the basis of this record, we do not believe that the federal exclusionary rule would encompass the situation where a private citizen, acting independently of any police solicitation, cooperation, or assistance violated section 605 of the Federal Communications Act by perpetrating an unlawful interception and then divulging the communication to the police. [26] Nor do we believe that the particular narrow factual situation of this case warrants invocation of the federal exclusionary rule. As so aptly phrased by Mrs. Marine's husband, she had "no other choice but to report" the substance of the conversation she had inadvertently "stumbled" upon. In upholding the trial court's denial of appellant's suppression motions, we do not believe that our decision in any way negates the necessity for compliance with both the federal law and Alaska's statutes regarding wiretapping and eavesdropping. Weighing against the necessity for respect of federal law is the inadvertent conduct of a private citizen and the duty of all citizens to cooperate and assist law enforcement agencies and officers in the detection and prevention of criminal conduct.

Appellant next contends that the trial court erred in admitting into evidence a .44 caliber pistol which the appellant had on his person when he was arrested. [27] The trial court admitted the weapon as part of the evidence of flight of the appellant to evade arrest. [28] The issue on this appeal as characterized by appellant, is as follows:

> Appellant does not contend on appeal that the trial court committed error in

---

24. 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed. 2d 1166, 1170 (1968).

25. In n. 5 of its opinion in *Lee*, the court said:
A party-line user's privacy is obviously vulnerable, but it does not necessarily follow that his telephone conversations are completely unprotected by § 605. In many areas of the country private telephone lines are not available; in other areas they are available only at higher rates than party lines. There is nothing in the language or history of § 605 to indicate that Congress meant to afford any less protection to those who, by virtue of geography or financial hardship, must use party-line telephones.

26. *Compare* Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); Watson v. United States, 391 F.2d 927 (5th Cir. 1968); State v. Hughes, 8 Ariz.App. 366, 446 P.2d 472 (1968).

27. It is uncontroverted that this weapon was not the one which was used in the homicide with which appellant was charged.

28. The record shows that for 14 days appellant eluded the police. On the morning of January 19, 1967, an Alaska State trooper effectuated the arrest of appellant. A reading of the applicable portions of the record shows the efforts

permitting Trooper Rudolph to testify that the appellant was armed at the time of arrest, or in permitting him to recount conversations concerning the pistol. Appellant does not even contend that a showing of flight is error even after a defendant has claimed self-defense. The issue is the physical admission of a piece of real evidence which had no probative value and was obviously prejudicial and suspected by the trial court to be prejudicial.

■ We hold that it was not error on the part of the trial court to admit the .44 caliber pistol obtained at the time of his arrest. In Churchill v. State [29] a similar contention was advanced where the court said:

> We have concluded that the holding * * * in Meyer v. State, 160 Tex.Cr.R. 521, 276 S.W.2d 286, must here control. In that case, a weapon, not used in the killing but which was found in the accused's possession, was held to be admissible. In the case at bar, the accused had fled from the scene and armed himself with still another weapon, and the evidence as to the second weapon would be admissible under the general doctrine

appellant made on the morning of January 19, 1967, to avoid arrest. Trooper Rudolph actually apprehended appellant as he was attempting to crawl away from an apartment building in which he had been hiding. When appellant stood up Trooper Rudolph observed a pistol sticking in the left side of his pants in appellant's belt. After conversation between appellant and the officer, appellant placed his gun on a table which was located just inside the door of the prem-

which permits a full showing as to flight. The fact that he later called the police would not alter the fact that he fled immediately after the shooting.

The *Churchill* decision is in accord with our understanding of the general rule of law on this question. Here testimony concerning appellant's possession of the weapon at the time of his apprehension, as well as introduction into evidence of the weapon itself, was relevant to the circumstances surrounding the arrest, the issue of flight, and appellant's assertion of self-defense.[30]

■ Appellant's final contentions in this appeal are for the most part duplicative of arguments which were advanced in Roberts v. State [31] and thus controlled by that decision. Appellant does contest certain rulings which were made in regard to bail by Superior Court Judges Ralph E. Moody and Hubert A. Gilbert. Assuming that such matters are properly before us, our review of the record has led us to the conclusion that no error was committed by either Judge Moody or Judge Gilbert in matters pertaining to the subject of appellant's bail.

The judgment and commitment entered below is affirmed.

ises from which he had sought to escape.

29. 167 Tex.Cr.R. 26, 317 S.W.2d 541, 542 (1958).

30. *See* State v. Rodriquez, 23 N.M. 156, 167 P. 426, 431–433, L.R.A.1918A, 1016 (1917); People v. Flannelly, 128 Cal. 83, 60 P. 670, 671–672 (1900).

31. 445 P.2d 674 (Alaska 1968).