498 P.2d 444

**The STATE of Arizona ex rel. J. Michael FLOURNOY, Coconino County Attorney, Petitioner,**

**v.**

**Laurance T. WREN, Judge of the Superior Court of Coconino County, et al., Respondents.**

**No. 10539.**

Supreme Court of Arizona,
In Banc.

June 20, 1972.

Rehearing Denied July 18, 1972.

J. Michael Flournoy, Coconino County Atty., Stephen G. Udall, Deputy County Atty., Flagstaff, for petitioner.

Flynn, Kimerer, Thinnes & Galbraith, by John J. Flynn, Tom Galbraith, Phoenix, for respondents and real parties in interest.

LOCKWOOD, Justice:

The State, through the County Attorney of Coconino County, sought by Special Action to secure an order of this Court quashing an order of the trial court of Coconino County. The trial court's order granted defendants' motion to suppress evidence discovered in the course of a search of a motel room and of a Chevrolet pickup camper. This evidence related to real parties in interest Murphy, Gilliland, Scotten and Prince, defendants charged with possession and transportation of marijuana. Arising from the same general circumstances, John Hafner and Daniel Standland, aka George Callaway aka George Conrad, were charged with possession of marijuana and L.S.D.

In the evening of October 13, 1969, Chris Newman, manager of the Kings House Motel in Flagstaff, received a call to pick up two men at the airport and bring them to the motel. Newman testified that at the time he transported the parties he noticed that they were "grubby looking" not very "talkative" and they exuded an "unusual odor." When the men arrived, the desk clerk, Armando Ronquillo, registered them to room 217.

Later that evening Ronquillo received a phone call from a party who "asked for room 217." Ronquillo testified that he accidentally overheard the conversation between the parties. One of the parties made a statement apparently in code consisting basically of "car trouble, contact would be late, put stuff on road, fly out immediately." Ronquillo reported the incident to Newman, who called the police. The "suspicious activity" was related to Officer Householder, who then cautioned

Newman to "keep an eye out for any other activity."

Later that same evening the parties in room 217 received another phone call which Newman intentionally overheard. He heard "that the people were coming. They were in town, and they were coming." Al Linder, another desk clerk, was told by Newman to watch room 217 from an adjacent empty room. While watching from a window of the room, Linder noticed two vehicles, a black Chevrolet and a pickup camper, drive in and park near room 217. One of the persons in the vehicles came to the office and registered to room 219 and the others went to room 217.

Newman immediately gave Officer Householder the description and license numbers of the two vehicles which had arrived. The officer observed the motel until the black Chevrolet departed. After following the automobile for a short time Householder "pulled it over." The driver, defendant Gilliland, was asked for his license and registration which he produced. The three other occupants of the car were defendants Murphy, Scotten and Prince. Householder asked Gilliland to have a seat in the police car while he filled out an identification card. Within a few minutes Officer Bert Stamper, a narcotics specialist, arrived, having been called by Householder. Stamper sat on the rear seat of Householder's police car and sniffed Gilliland's jacket. He informed Householder that the jacket smelled of marijuana.

Householder asked Gilliland if he could "look into his car," to which Gilliland assented. The officer then asked if he could have the keys to the trunk. Gilliland refused, and responded, "well my cooperation stops here, I think you are hasseling [sic] me." All four of the occupants of the car, Gilliland, Murphy, Prince and Scotten, were then taken to the police station.

While the defendants were seated in the station, Stamper peered through the window of the vehicle and noticed a "roll your own cigarette" which he examined and discovered to contain marijuana. Gilliland and Scotten were then formally arrested. After the car was searched a "baggie of marijuana" was found and the other two parties, Prince and Murphy, were formally arrested. A green substance suspected to be marijuana was removed from the teeth of Scotten and Gilliland. Scotten told police officers that room 219 was "clean" but that he did business in room 217.

At approximately 2:00 a.m. the officers procured a search warrant for rooms 217 and 219 and the pickup camper. After announcing their purpose, the officers were admitted to room 217 by defendant Standland. Defendant Hafner was lying on a bed. The officers searched the room and found small quantities of marijuana and a black briefcase containing marijuana, L.S.D. and marijuana stalks. They also found a pipe, marijuana and "dangerous drugs" on the person of Standland. Hafner and Standland were arrested, and a search was made of room 219 and the pickup camper. The search of the vehicle produced "53 five pound cans of marijuana."

The defendants jointly filed a pretrial motion to suppress the evidence on the grounds that it was obtained pursuant to various unlawful searches and seizures. Coconino County Superior Court Judge Laurance T. Wren granted the motion to suppress in part and denied it in part.

The court found that the search of the Chevrolet sedan, which defendant Gilliland was driving, was valid as to Gilliland, but the search of the pickup camper and the rooms was invalid as to defendants Murphy, Scotten and Prince. Therefore the evidence obtained as a result of the search, under the doctrine of "fruit of the poisonous tree", could not be used in trial against these defendants. Although the court found that there was probable cause to justify the issuance of the search warrant, the warrant was found defective because (1) it was issued under the caption of the City Police Court, but signed by a Justice of the Peace; (2) it was not sealed; and (3) the affidavit for the warrant did not contain

the positive language which at that time was required by A.R.S. § 13–1447 for a *nighttime search.*

## TELEPHONE INTERCEPTIONS

Defendants argue that the telephone conversations which were overheard by Ronquillo and Newman were "willful interceptions" of "oral communications" prohibited by the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.A. §§ 2510–2515 (1968), herein referred to as the Omnibus Crime Act. They contend that the stopping of the vehicle, the seizure of the items from the persons in the vehicle and the seizure of the items in rooms 217 and 219 and in the camper were a direct result of these alleged illegal interceptions. Consequently, they urge that under the doctrine of the "fruit of the poisonous tree," that the evidence obtained as a result thereof is inadmissible. We do not agree.

The Federal Communications Act, Title VI, § 605, 48 Stat. 1103 (1934) provided that no person not authorized by the sender was permitted to intercept any communications and divulge the existence of the contents of the intercepted communication. It was rewritten in 1968 and limited to radio communications. We are of the opinion, however, that § 2511 of the Omnibus Crime Act was meant to supplant § 605 of the Communications Act, since the same crime is prohibited in both acts. See discussion in Cross v. State, 225 Ga. 760, 763, 171 S.E.2d 507, 509 (1969).

The Supreme Court of the United States in Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166 (1968) held that § 605 of the Federal Communications Act is applicable to the states, although that Court has not yet actually determined the same as to the Omnibus Crime Act, *but see* Alderman v. United States, 394 U.S. 165, 175, 89 S.Ct. 961, 967, 22 L.Ed.2d 176, 187–188 (1969). Regardless of whether the Omnibus Crime Act may be held applicable to the states, in view of the facts of this case it is apparent that the defendants

could not prevail since § 2511 requires a *willful* interception in order to constitute a violation. Roberts v. State, 453 P.2d 898 (Alaska 1969), cert. denied, 396 U.S. 1022, 90 S.Ct. 594, 24 L.Ed.2d 515 (1970).

Ronquillo consistently testified that he overheard the conversation accidentally. He was asked on direct examination:

"Q. I understand your purpose in listening in to any part of the conversation is merely to be sure that the call has been placed, is that right?

"A. That the receiver, the party at the motel receives the call because otherwise we offer the courtesy of taking a message for them.

"Q. But in this one as soon as you heard the two voices you didn't hang up, you continued to listen in on it, is that correct?

"A. Yes.

"Q. Was it immediately suspicious to you then?

"A. No, the way I ended up listening to part of it was that I was away from the switchboard, we have a twenty foot extension on the switchboard and I was writing figures at the time and when they answered I didn't stop immediately and jump up, I finished what I was writing and then went over to turn it off."

■ This testimony conclusively indicates that the interception of the conversation by Ronquillo was in fact inadvertent. The fact that Ronquillo did not hang the phone up promptly does not in any way change the situation. He was in the ordinary performance of his duty when he connected the call and was unable to disconnect his line immediately. Roberts v. State, *supra.*

■ The phone call overheard by Newman may have been a violation of § 2511, *supra,* because it was intercepted deliberately. An examination of the substance of the conversation, however, reveals that it was so insignificant that it could not have in any way contributed to the probable

cause needed for the arrest of the defendants. Consequently no evidence was derived from it under the "fruit of the poisonous tree doctrine."

## STOP AND DETENTION

Defendants Gilliland, Murphy, Scotten and Prince argue that the officers did not have reasonable cause to stop and detain them on the road and that the search of their vehicle was therefore illegal, citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

██ Even applying the principle enunciated in *Terry, supra,* we believe the officers had reasonable cause to stop and detain the defendants. Officer Householder at the time he stopped the defendants knew of the phone call which Ronquillo had inadvertently overheard. He was aware of the facts leading to Newman's conclusion that the defendants had "acted suspiciously", and had the license numbers of the vehicles belonging to the defendants. These facts were sufficient to constitute reasonable cause under the circumstances to stop the parties while on the road for the purpose of a limited inquiry in the course of investigation. To require more than this would be an intolerable manacling of law enforcement by preventing any police investigation, even routine, without establishing probable cause. *See also*, Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) where the Supreme Court of the United States held lawful the stopping and removal of a gun from a defendant sitting in a vehicle. The requisite reasonable cause for the stop and frisk was supplied by an informant's tip.

## ARREST

██ When Gilliland refused a search of the trunk of his car, one of the officers "asked [him] to follow them to the station." The defense contends that at this point an arrest of all the parties occurred. We agree.

Where the suspects' liberty of movement is restricted by the officers, arrest is complete. *See* Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Swetnam v. F. W. Woolworth Co., 83 Ariz. 189, 318 P.2d 364 (1957); State v. Vaughn, 12 Ariz.App. 442, 471 P.2d 744 (1970). While inside the police car Gilliland was asked for his trunk keys "and he was very hesitant." He then got out of the police car without permission. Officer Householder followed Gilliland, stood between him and his vehicle and again requested the keys to the trunk. It was then that Gilliland said "this is where my cooperation stops." Officer Stamper told him "well, we will have to ask you to come to the police station and look into this matter further."

Officer Stamper testified that "[i]n [his] opinion they weren't free to go." When asked whether the parties had a choice to refuse to accompany them to the station, Officer Householder said that Gilliland had no choice and he didn't know what he would have done if the others had gotten out of the car, "but they went to the police station." The defendants were escorted to the police station, Householder driving in front of their car and Stamper behind. We believe this was sufficient restriction to constitute an arrest.

## PROBABLE CAUSE FOR ARREST

The crucial question at this point is whether the officers had sufficient cause for arrest of the defendants in the black Chevrolet.

██ The often repeated standard for determining probable cause is whether the evidence would warrant a man of reasonable caution to believe that a crime has been committed and that the persons suspected have in fact committed the crime. See State v. Dessureault, 104 Ariz. 380, 386, 453 P.2d 951, 957 (1969) cert. denied, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). The Supreme Court of the United States has defined the standard as more than suspicion but less than what is necessary to establish guilt. See Henry v. Unit-

ed States, *supra,* 361 U.S. at 101–102, 80 S.Ct. at 170–171, 4 L.Ed.2d at 138.

■ The inadvertently overheard phone call, though possibly susceptible of other interpretations, implicitly suggested that someone had possession of drugs which were going to be removed out of state. The officers had obtained the license numbers of both vehicles which had arrived at the motel. One (the black Chevrolet) they saw leave the motel. When the officers stopped this vehicle they observed the demeanor of Gilliland during the investigation, and he appeared "nervous". This observation coupled with the fact that his jacket emitted the smell of marijuana gave the officers reasonable cause to believe he had been in possession of marijuana, contrary to law. The Supreme Court of the United States has stated that odors may be "found to be evidence of most persuasive character." Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948). The fact that the officers had reason to believe that Murphy, Scotten, and Prince had visited the room where the phone call had been made, in combination with the close and constant association of these defendants with Gilliland gave the officers probable cause to believe that they had committed the crime also.

## SEARCH OF THE CAR INCIDENT TO THE ARREST

While at the police station a search of the vehicle was made. Officer Stamper examined a cigarette he found in the car and concluded that it was marijuana. A "baggie" of marijuana was also found in the trunk.

Defendants contend that this was an illegal search and the fruits should be suppressed. We do not agree.

In Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), in reaffirming the doctrine of Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the court held:

"The rationale of Chambers is that *given* a justified initial intrusion, there is little difference between a search on the open highway and a later search at the station. Here, we deal with the prior question of *whether* the initial intrusion is justified." Coolidge v. New Hampshire, *supra,* 403 U.S. at 463, n. 20, 91 S.Ct. at 2036, 29 L.Ed.2d at 581.

The Court elucidated under what circumstances the initial intrusion would be vindicated.

"'[E]xigent circumstances' justify the warrantless search of 'an automobile *stopped on the highway,*' where there is probable cause * * *." Id., 403 U.S. at 460, 91 S.Ct. at 2035, 29 L.Ed.2d at 579.

The court further gave some examples of exigent circumstances: an alerted criminal bent on flight; fleeting opportunity on an open highway after a hazardous chase; contraband or stolen goods or weapons; confederates waiting to move the evidence; inconvenience of special police detail to guard the immobilized auto. *Coolidge, supra.*

■ Application of the rule in *Chambers* and *Coolidge* to the facts here indicates that the search was lawful. First, the initial intrusion was justifiable. At the time the officers asked the parties to accompany them to the station there was probable cause to believe that there was contraband in the car for the same reasons that there was probable cause to arrest the occupants. There were also the requisite exigent circumstances at the time of this intrusion to justify a search. Here the car was stopped on the highway, the defendants were alerted and bent on flight. Under the circumstances the officers could not be sure that they had all the parties in custody. Because they could have searched the car on the highway the later search at the station was justified.

## SEARCH OF GILLILAND

The defendants, citing Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) as authority, argue that the police used undue force to extract the parti-

cles from the teeth of Gilliland in violation of due process. It is urged that because of this illegal exercise of force the particles found on the teeth of that defendant cannot be used to obtain a conviction.

■ It is our opinion that the extraction of the particles from Gilliland's teeth was not a violation of the due process clause. When asked on cross-examination how the substance was removed from Gilliland's teeth, Officer Stamper testified:

"A. I used a cap off of a ballpoint pen.

"Q. Well, did he just open up his mouth while you did this?

"A. No, sir, he refused to open his mouth.

"Q. How did you get his mouth open?

"A. In this manner (indicating).

"Q. In other words, you forced it open?

"A. I did.

"Q. And who was helping you when you forced it open?

"A. I believe Sergeant Householder had a hold of his shoulders from the rear."

In *Rochin, supra,* the Court invalidated a state conviction for illegal possession of morphine which had been based on evidence of two capsules which the accused had swallowed and then had been forced by the police to disgorge. The three officers in that case had been acting with neither a judicial warrant nor probable cause. The facts of the instant case are substantially different. Here the officers searched Gilliland incident to a proper arrest and the force used to extract the particles was not of sufficient magnitude to "shock the conscience" of the court.

The facts of the present case resemble more closely those of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L. Ed.2d 908 (1966). There the United States Supreme Court upheld the extraction of blood for a drunk driving test, ruling that where a defendant resists the police may respond with appropriate force. It is our conclusion that the force used by the police in the instant case was not inappropriate.

## POSSESSION

■ Defendants urge that because there was no evidence that they were guilty of possessing the narcotics found in the ash tray, the trunk of the Chevrolet sedan, or on the teeth of Gilliland, there was not enough evidence to bind them over for trial.

The question at this stage of the proceedings is whether there was probable cause to believe the defendants Murphy, Gilliland, Scotten and Prince had committed the crime of possessing and transporting marijuana. The United States Supreme Court has held that in order to show probable cause "[e]vidence required to establish guilt is not necessary." Henry v. United States, *supra,* 361 U.S. at 102, 80 S.Ct. at 171, 4 L.Ed.2d at 138. Having decided that there was probable cause, we find no merit in defendant's contention.

## SEARCH WARRANT

It is urged that the affidavit was insufficient in that it did not state facts which would justify a reasonable belief that marijuana was contained in either the King's House Motel or in the camper.

■ The rule is that the affiant must show the underlying circumstances which would justify a reasonable belief that the place or places to be searched contain the contraband or other evidence that will connect the accused with his alleged crimes. Aguilar v. Texas, 378 U.S. 108 at 111–116, 84 S.Ct. 1509, at 1512–1515, 12 L. Ed.2d 723, at 726–729 (1965). It is also the rule that only sworn testimony in addition to the affidavit can be appropriately considered by the magistrate. State v. Watling, 104 Ariz. 354, 453 P.2d 500 (1969). It is not necessary, however, that the testimony be in writing. State v. Watling, *supra.* *See also,* State v. Snyder, 12 Ariz.App. 142, 468 P.2d 593 (1970), cert.

denied, 400 U.S. 1001, 91 S.Ct. 475, 27 L. Ed.2d 452 (1971).

■ The affidavit for the search warrant in this case stated the following facts as grounds for the issuance of the search warrant:

"That Gilliland has marijuana in his teeth plainly visible. That Gilliland had marijuana in his ashtray plainly visible from without the vehicle, that a search of the vehicle was made and marijuana found in the trunk. That Chris Newman, Armando Ronquillo overheard a 'conversation wherein the statement was made that they were not to fly the 'stuff' out, but to put it in a car on the road. That these subjects were all visiting the described rooms. That the subject stated that he had met Mason for business purposes at these rooms."

In addition, Stamper testified that he was sworn in by Judge Brierly and that he then explained in detail the circumstances for issuance of the warrant and the reasons "why [he] couldn't wait until morning" to have it issued. He told Judge Brierly under oath:

"About an airplane, wherein the subjects were associated with; and the telephone conversation that had been overheard by Mr. Newman; and I didn't feel that they would be there in the morning; and we would possibly miss them if we waited until the morning. Also he asked me if this was Earl Newman, and I said, 'no, it is Mr. Newman's son.' He did say that he knew he had met Earl's son. He asked me who Mr. Ronquillo was, and I told him I didn't know; and Sergeant Householder entered the discussion in this regard."

When asked whether he had any other discussion with Judge Brierly, Stamper stated:

"Yes, sir, there was, but I can't recall it in the order. We did discuss everything in here, because he went over it point by point."

Officer Householder was not under oath; consequently his testimony will not be considered. State v. Watling, *supra*. We conclude that there was sufficient information contained in the affidavit and communicated to Judge Brierly under oath for formation of a reasonable belief that there was contraband in the motel rooms and camper.

Defendants contend that the warrant was defective because the informant was not proven reliable to the magistrate.

■ The United States Supreme Court has in a recent decision diluted the importance of proving the informant's reliability. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). It now appears that the paramount concern when judging the constitutionality of a warrant based upon an informant's tip is whether the information given is inherently reliable. The fact that the informant has proven reliable in the past is now only an indicium of reliability. The question is whether there is "substantial basis" for crediting the information given by Ronquillo. We believe that this standard was met in this case.

First, we are of the opinion that Ronquillo was a reliable informant. Where an ordinary citizen volunteers information which he has come upon in the ordinary course of his affairs, completely free of any possible gain from furnishing the information, reliability is enhanced. *See* Jaben v. United States, 381 U.S. 214 at 224, 85 S.Ct. 1365 at 1370–1371, 14 L.Ed.2d 345 at 352 (1965); Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966). As a result, we hold that Ronquillo was a reliable informant.

An additional reason for our belief that the information was credible is that it was corroborated by the independent investigation of the officers. The finding of the marijuana in the possession of four of the parties who had recently been visiting in the room where the phone call was made gave the suggestion implicit in the phone

call (that drugs were going to be transported) greater credulity.

■ The next issue raised by the defendants is whether the warrant was void for failure to meet the requisite for a nighttime search warrant. The warrant was issued before A.R.S. § 13–1447 (1956) was amended,[1] and therefore its validity is governed by the former law. At the time the warrant was issued, the statute provided that unless the affidavits were "positive that the property [was] on the person of the party, or in the place to be searched," the warrant had to be issued for the daytime only.

In State v. James, 10 Ariz.App. 394, 459 P.2d 121 (1969) the Court of Appeals held that under the old statute it was not mandatory that the officer be positive, but it was mandatory that he state facts which would provide the court with an indication that the property was in the place to be searched, and that a nighttime search was indicated.

We are of the opinion that the affidavit, together with the sworn oral testimony of Officer Stamper, was sufficiently definite and explicit. See State v. Kelly, 99 Ariz. 136, 407 P.2d 95 (1965); State v. Snyder, 12 Ariz.App. 142, 468 P.2d 593 (1970). The officers found the marijuana in the possession of four of the defendants. This finding corroborated the suggestion, implicit in the phone conversation overheard by Ronquillo, that drugs had been flown in and were going to be driven out.

Defendant argues that the warrant is invalid because it named in the affidavit a "68 Chevrolet pick-up truck, white, Calif. N. 18810". The vehicle actually searched was a 1963 white Chevrolet pick-up (camper) with the same license number.

■ We agree that the warrant must describe with particularity the places and things to be searched. This rule, however, is not so rigid as to invalidate a warrant for a minor error in description. State v. Reynolds, 11 Ariz.App. 532, 466 P.2d 405 (1970); See Bowling v. State, 219 Tenn. 224, 408 S.W.2d 660 (1966). We therefore hold that the slight discrepancy in the warrant stating the wrong year of the pick-up did not invalidate the warrant.

■ One reason the warrant was invalidated by the lower court was that it was issued under the caption of "The City Court of the City of Flagstaff", but was signed by the Justice of the Peace and was not sealed. We find that these defects do not in this case invalidate the warrant.

As a Justice of the Peace, Judge Brierly had the power to issue warrants and the designation of his office appeared under his signature as "Judge or Justice of the Peace." A.R.S. § 1–215(11) (Supp.1972). The fact that the words "In the City Court of the City of Flagstaff" appeared in the heading of the form of the warrant did not invalidate the warrant, since it complied substantially with the requirements set forth in the former A.R.S. § 13–1445 (1956).

■ Seals serve as authentication of an instrument and add dignity to the document. Caruthers v. Peninsular Life Ins. Co., 150 Fla. 467, 7 So.2d 841 (1942). They are required on an official document issued by a Justice of the Peace to be used to authenticate them. The defendants, at the time of the search, did not object to the lack of a seal on the search warrant, and admitted the officers to their motel. We hold that the absence of the seal did not invalidate the warrant.

We hold that in granting the motion to suppress, the lower court acted in excess of its jurisdiction. Therefore it is ordered

---

1. The amended statute, A.R.S. § 13–1447 (Supp.1972) now reads: "Upon a showing of good cause therefor, the magistrate may, in his discretion insert a direction in the warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant may be served only in the daytime. For the purposes of this section night is defined as the period from ten p. m. to six-thirty a. m."

quashing the trial court's order granting defendants' motion to suppress, and remanding the case to the trial court for further proceedings.

HAYS, C. J., and STRUCKMEYER, J., concur.

CAMERON, V. C. J., and HOLOHAN, J., concur in the result.