STATE of Utah, Plaintiff and Appellee,

v.

Henry S. BRUCE, Jr., Defendant and Appellant.

No. 860325.

Supreme Court of Utah.

July 28, 1989.

Debra K. Loy, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Salt Lake City, for plaintiff and appellee.

HOWE, Associate Chief Justice:

Defendant Henry S. Bruce, Jr., appeals from his jury conviction of aggravated robbery, a felony of the first degree. Utah Code Ann. § 76–6–302 (1978, Supp.1989).

On November 26, 1985, the Corner Mart gas and convenience store in northwest Salt Lake City was robbed. At approximately 3:00 in the afternoon, Sue Ann Candelaria, a store employee, received a phone call from a man claiming to have a gun pointed directly at her. He instructed her to put all the money from the register in a bag and give it to a man who would soon be entering the store. The caller threatened to shoot her if she did not comply. Within a few minutes, a young man whom she subsequently identified as defendant entered the store and placed his hand under his jacket as though he had a gun and demanded that Candelaria "do what the man on the phone said." She did not see a gun and later testified that she could not recall that the man made any reference to his having a gun. She stated, "It just looked like a normal thing, like a gun, but it wasn't. I knew it wasn't." Without putting the money in a bag, she gave the robber approximately $214, and he left the store, heading north on foot. As he walked away, Candelaria saw him appear to place the money down the front of his pants.

Candelaria's sister, Ruthie K. Barton, was at the store at the time of the robbery. She stood at the side of the counter only four or five feet from the robber, whom she later identified as defendant. When the man fled from the store, Barton followed him at a distance of about 25 to 30 feet. She also testified that he appeared to place the money down the front of his pants. Barton followed him as he crossed the street and observed him enter a walk-way between two apartment buildings, after which she did not see him again. She did, however, soon see an orange Datsun station wagon drive away from the parking lot of the apartment buildings, but she admitted that she did not see anyone enter the car, nor could she see the persons in the car. She further testified that inasmuch as she was a resident of one of the apartments in the complex, she was familiar with the automobiles of the other residents and the orange car did not belong to any of them.

Barton immediately returned to the store and told police officers, who arrived within minutes, what had occurred. She described the robber as a black male approximately 5 feet 7 inches in height, wearing dark corduroy pants, a dark sweat jacket with white lines, and a ski cap. Candelaria gave a similar description. An all-channel police broadcast was then disseminated by the officers stating that an armed robbery had occurred and instructing all police officers to be on the look-out for an orange Datsun or Volkswagen four-door sedan or station wagon, with two black males suspected of robbery, both riding in the front seat.

Police Officer Carl G. Hills heard the broadcast and, driving in the direction of the robbery, observed an orange Datsun station wagon with two black males in the front seat. Officer Hills followed the car for about three blocks but could detect no increase in the car's speed. Because the car and passengers matched the descriptions of the broadcast, Officer Hills notified the dispatcher of his location, that he was in pursuit, and that he was going to attempt to pull the car over. Believing the passengers to be "possible armed robbery suspects," Officer Hills made a high intensity stop in accordance with normal police procedures under the circumstances. Several other officers immediately arrived on the scene, frisked the suspects for weapons, and detained the driver, Otis Latham, and defendant until a witness arrived to make an identification. A broadcast was then dispatched back to the officers at the Corner Mart informing them that a vehicle conforming to the prior description had been stopped and requesting a witness to identify the vehicle and suspects.

Barton, who overheard the broadcast, accompanied a police officer to the location where the vehicle had been stopped and immediately identified the car as the one she had seen leaving the apartment complex parking lot. She then identified both suspects, who were standing with police officers beside the car. The driver of the car was identified by Barton as a man who had been in the store the prior evening inquiring about the store's phone number, which was not listed in the telephone directory. She identified defendant as the robber, and the suspects were placed under arrest for the robbery. Police officers then searched the suspects and the vehicle and seized three one dollar bills from the floor of the vehicle, $104.93 from Latham and $101 from defendant, which money was tucked down the front of his pants. No weapons were found.

## I.

Defendant first contends that the stop by Officer Hills and his subsequent arrest violated his constitutional rights under the fourth amendment to the United States Constitution and article I, section 14 of the Utah Constitution. It therefore follows, defendant argues, that the trial court committed prejudicial error in denying his pretrial motion to suppress evidence obtained from the illegal stop and arrest, specifically, the out-of-court identification by Barton.

■ The State initially responds that defendant failed to preserve this issue for appeal in that he made only a pretrial motion to suppress the challenged evidence

and did not make any objection to the introduction of that evidence at trial. Relying upon our decision in *State v. Lesley*, 672 P.2d 79, 82 (Utah 1983), the State argues that in order to preserve the issue challenging the admission of evidence at trial, "a specific objection is required even where a pretrial motion to suppress has been made." We later held, however:

> [T]he rule in *Lesley* does not require a defendant to object or to renew his motion to suppress at trial where the trial judge is also the judge who ruled on the pretrial motion and where the record or transcript indicates that an evidentiary hearing was held. Since the trial judge in this case was also the judge who presided at the suppression hearing, the defendant's failure to object at trial did not constitute a waiver of his Fourth Amendment claim.

*State v. Johnson*, 748 P.2d 1069, 1071–72 (Utah 1987). While it may be prudent for defense counsel to notify judges who have ruled on pretrial suppression issues that a defendant's objections to challenged evidence are reserved and not withdrawn, *Johnson*, 748 P.2d at 1076 (Durham, J., concurring separately), an evidentiary hearing on the motion to suppress was held in this case and the trial judge presided over that hearing. The motion was denied, and accordingly, defendant did not waive his right to appellate review by failing to further object to the admission of the evidence at trial.

██ In the absence of clear error, we uphold a trial judge's factual assessment underlying a decision to grant or deny a suppression motion. *State v. Mendoza*, 748 P.2d 181, 183 (Utah 1987); *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987); *State v. Branch*, 743 P.2d 1187, 1189 (Utah 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1597, 99 L.Ed.2d 911 (1988). The error complained of by the defendant in this case is the "lack of a basis for the initial police broadcast which, in theory, gave Officer Hills the probable cause to stop the vehicle" and which led to the subsequent identification of defendant, his arrest, and the seizure of incriminating evidence introduced at trial. Defendant argues that Bar-

ton provided the police officers with insufficient information for the broadcast placing the robber of the store in the orange car. The facts only revealed that Barton observed the robber, whom she followed on foot, enter a walkway between two apartment buildings. She did not see the man again and, specifically, did not see him enter the orange car, nor could she see anyone in the car as it drove away. The police broadcast, however, placed not one, but two, black males in the front seat of the orange car. Thus, it is argued, the police officers took liberties with the facts and issued the broadcast without probable cause for a stop. The issue, then, is the validity of the stop by Officer Hills in reliance on the broadcast issued by other police officers concerning possible armed robbery suspects.

Defendant cites *Whiteley v. Warden of Wyoming State Penitentiary*, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), for support. In that case, a county sheriff in Wyoming obtained an arrest warrant for a person suspected of burglary. The sheriff then issued a statewide law enforcement radio broadcast describing the suspect, his car, and the property taken. The broadcast did not specify the evidence that gave the sheriff probable cause to believe the suspect had committed the burglary. In reliance on the radio broadcast, police officers in Laramie stopped the suspect and searched his car. The Supreme Court ultimately held that the sheriff had lacked probable cause to obtain the warrant and that the evidence obtained during the search had to be excluded at trial. In so ruling, the Court stated:

> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from chal-

lenge by the decision of the instigating officer to rely on fellow officers to make the arrest.

*Whiteley*, 401 U.S. at 568, 91 S.Ct. at 1037, 28 L.Ed.2d at 313.

The Supreme Court later explained: "This language in *Whiteley* suggests that, had the sheriff who issued the radio bulletin possessed probable cause for arrest, then the Laramie police could have properly arrested the defendant even though they were unaware of the specific facts that established probable cause." *United States v. Hensley*, 469 U.S. 221, 230–31, 105 S.Ct. 675, 681, 83 L.Ed.2d 604, 613 (1985). The Court further explained:

> Thus *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest. It does not turn on whether those relying on the flyer were themselves aware of the specific facts which led their colleagues to seek their assistance.

*Hensley*, 469 U.S. at 231, 105 S.Ct. at 681, 83 L.Ed.2d at 613 (emphasis in original). In the present case, defendant argues that the police officers who issued the bulletin lacked probable cause to stop the orange car; thus, the stop by Officer Hills was invalid. We disagree.

 It is clear that police officers "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906–07 (1968). In justifying the particular intrusion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906. We have held that a "brief investigatory stop of an individual by police officers is permissible when the officers 'have a reasonable suspicion, based on objective

facts, that the individual is involved in criminal activity.'" *State v. Carpena*, 714 P.2d 674, 675 (Utah 1986) (per curiam) (quoting *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362 (1979)); *State v. Swanigan*, 699 P.2d 718, 719 (Utah 1985) (per curiam); *see also State v. Dorsey*, 731 P.2d 1085, 1087 (Utah 1986); Utah Code Ann. § 77–7–15 (1982). Furthermore, the United States Supreme Court has clearly held that these standards for a *"Terry* stop" apply when the stop is made in reliance on a bulletin issued by other police officers, as in the present case. In *Hensley*, the Court held:

> We conclude that, if a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification, to pose questions to the person, or to detain the person briefly while attempting to obtain further information. If the flyer [or bulletin] has been issued in the absence of a reasonable suspicion, then a stop in the objective reliance upon it violates the Fourth Amendment.... Assuming the police make a *Terry* stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing [officers].

*Hensley*, 469 U.S. at 232–33, 105 S.Ct. at 682, 83 L.Ed.2d at 614–15 (citations omitted; emphasis in original); *see generally* 3 W. LaFave, *Search and Seizure* § 9.3(f) (2d ed.1987).

 We find no error in the trial court's factual evaluation underlying its decision to deny the motion to suppress. While the police officers who issued the broadcast . may have improperly placed two black males in the front seat of the orange car, other sufficient information was provided and "articulable facts" existed to support

at least a "reasonable suspicion" that the robber of the store was in the orange car. Thus, the stop was made in "objective reliance" on the broadcast, which was issued by officers possessing "a reasonable suspicion justifying a stop."

## II.

■ Defendant next contends that the trial court erred in failing to suppress the in-court identification of him by Officer John Merrick. Merrick was employed by the Salt Lake County Sheriff's office and worked at the county jail. While off duty during the day (and at the approximate time) of the robbery, Merrick testified that he stopped his car at a red light on his way to a convenience store and observed two black males standing at a phone booth across from the Corner Mart. He specifically testified that he recognized both men but knew the name of only one, Otis Latham. Merrick proceeded to the convenience store for a few minutes and on his way back, while stopped for a red light at the same intersection, he again observed the two men at the phone booth. His total observation of the men lasted about two minutes. Merrick then went goose hunting for the rest of the day.

The next morning, Merrick went to work and, looking at the docket sheets, learned that Latham had been arrested in connection with the robbery of the Corner Mart. He also learned that the man arrested with Latham was named Henry Bruce. Merrick then pulled the arrest file of Henry Bruce "and looked at his photograph to see if it was the same guy [he] had seen before." He immediately concluded that Henry Bruce was the name of the man he had recognized the day before. At the pretrial suppression hearing, Merrick testified that he recognized defendant from the county jail and had seen him there on more than one occasion but did not know his name until he pulled his file after looking at the docket sheets. To prevent undue prejudice to defendant, the trial court instructed Merrick to testify at trial without any reference to the county jail. At trial, Merrick made an in-court identification of defendant

as the man he had seen with Latham at the phone booth across from the Corner Mart just before the robbery.

Defendant argues that the identification was based on a "suggestive out-of-court one photo show-up conducted by Officer Merrick" in violation of his due process rights. The danger of such an identification procedure, of course, is the heightened chance of misidentification wherein a witness "thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification." *Simmons v. United States*, 390 U.S. 377, 383–84, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253 (1968). In determining the validity of photographic identification procedures, the United States Supreme Court has set the standard:

> [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons*, 390 U.S. at 384, 88 S.Ct. at 971, 19 L.Ed.2d at 1253. Adopting this standard, we have ruled:

> [T]he circumstances of the individual case should be scrutinized carefully by the trial court to see whether in the identification procedures there was anything done which should be regarded as so suggestive or persuasive that there is a reasonable likelihood that the identification was not a genuine product of the knowledge and recollection of the witness, but was something so distorted or tainted that in fairness and justness the guilt or innocence of an accused should not be allowed to be tested thereby. This is something which because of his recognized prerogatives and advantaged position with respect to the trial, it is primarily the responsibility of the trial court to make the determination, which

should not be disturbed unless it appears clearly that he was in error.

*State v. Perry,* 27 Utah 2d 48, 51, 492 P.2d 1349, 1352 (1972).

In denying defendant's pretrial motion to suppress Merrick's identification testimony, the trial court specifically stated:

The Court doesn't feel that this fits within the dangers that the Supreme Court has been concerned about and there is nothing really suggestive. He really identified him in his mind the day before. It isn't like seeing someone that you don't recognize, but later on seeing one photograph and identifying him. This is an individual he knew by appearance and then he ascertained the name by checking photographs. So, the Court feels that it should allow this witness's testimony, but it is only going to allow the State to go forward only to a certain degree with it.

We find no error. Merrick recognized defendant when he saw him standing near the phone booth with Latham. Even though he did not know defendant's name, he recognized him by appearance as someone he had seen before, on more than one occasion, at the county jail. The following morning, when he looked at the photograph in defendant's arrest file, Merrick merely attached a name to a face he was already familiar with. Although this is an unusual fact situation, there was no reasonable likelihood of irreparable misidentification at trial resulting from Merrick's conduct, and the ruling will not be disturbed.

### III.

■ We next consider defendant's assertion that the trial court committed prejudicial error by refusing to give a requested cautionary jury instruction on eyewitness identification. In *State v. Long,* 721 P.2d 483, 492 (Utah 1986), we made a detailed consideration of the reliability, complexity, and "generally unperceived flaws" of eyewitness testimony and directed that "in cases tried from this date forward, trial courts shall give such an instruction whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." Defendant's trial, however, preceded our decision in *Long.* Prior to *Long,* "this Court had consistently held that the decision to give a jury cautionary instructions regarding the reliability of eyewitness identification was a matter strictly within the trial court's discretion and to be decided by considering 'the totality of the circumstances.'" *State v. Jonas,* 725 P.2d 1378, 1380 (Utah 1986), and cases cited therein.

We have never found an abuse of discretion when a judge refused a cautionary instruction in a case with more than one eyewitness. *State v. Branch,* 743 P.2d at 1190. In the instant case, the jury heard testimony from four eyewitnesses who either identified defendant as the man who robbed the Corner Mart or placed him in the area at the time of the crime. Defendant, however, contends that the identifications were sufficiently unreliable as to warrant a cautionary instruction from the court. Seven weeks after the robbery, a police lineup of defendant and several others was conducted wherein Candelaria, Barton, and Janine Dempsey, a salesperson from a nearby store, participated. None of these witnesses could identify defendant at the lineup. In fact, Candelaria and Barton selected another individual as the robber, while Dempsey made no selection at all. Officer Merrick did not participate in the lineup. In addition, defendant claims to have a prominent gold tooth and a tattoo on his forehead, neither of which were identified by the witnesses' initial descriptions of the robbery suspect. Until specifically pointed out by defendant, however, the tooth and tattoo could not be seen at trial.

Still, under the totality of the circumstances, we cannot say that the trial court abused its discretion in refusing to give the cautionary instruction. Four eyewitnesses identified defendant. Candelaria and Barton witnessed the entire robbery and stood only an arm's length from the man they

both identified as defendant. They had a particularly good opportunity to observe him. Barton identified defendant as the man who robbed the store just moments after he had been stopped by Officer Hills. Officer Merrick recognized defendant when he saw him at the phone booth across from the Corner Mart. He was familiar with his face and appearance from prior occasions. At trial, Merrick identified defendant as the man he had seen with Latham near the scene of the crime.

Furthermore, it is highly likely that the result would have been exactly the same even if a cautionary instruction had been given. *Jonas,* 725 P.2d at 1380–81 (where we discussed pre-*Long* cases to emphasize this point). The State presented corroborating evidence at trial, and defense counsel's cross-examination of the State's witnesses and extensive closing argument more than sufficiently alerted the jury to the possibility of error in eyewitness identification. *State v. Suniville,* 741 P.2d 961, 965 (Utah 1987).

### IV.

Defendant next argues that the trial court committed reversible error by denying his pretrial motion to suppress evidence of his prior convictions. Specifically, defendant's record included a 1984 conviction for retail theft, a class A misdemeanor under Utah Code Ann. § 76–6–412(1)(c) (1978, Supp.1989), a 1980 conviction for retail theft, a second degree felony under section 76–6–412(1)(a), and a 1979 conviction for attempted burglary, a class A misdemeanor under section 76–4–102(4). The trial court allowed the convictions to be used for impeachment purposes on the ground that "stealing types of crimes are crimes of dishonesty" and are automatically admissible. The court relied on our decision in *State v. Cintron,* 680 P.2d 33, 34 (Utah 1984), where we ruled that a prior misdemeanor theft conviction was admissible to test credibility as involving "dishonesty" under the former rule 21 of the Utah Rules of Evidence. Defendant argues, however, that his prior convictions were not for crimes involving "dishonesty or false statement" under present rule 609(a) of the Utah Rules of Evidence (controlling at his trial) and should have been excluded.

The present Utah Rules of Evidence, effective September 1, 1983, are in substantial part the Federal Rules of Evidence. Utah rule 609(a) provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

It is clear from the rule that impeachment by prior convictions falls into two categories. Under 609(a)(2), if the crime involved dishonesty or false statement, the conviction may be used to impeach whether it is classified as a misdemeanor or felony. The mandatory language of the rule leaves the trial court with no discretion to exclude the evidence. Under 609(a)(1), if the conviction was for another type of felony, it may be used only if the trial court determines that the probative value outweighs the prejudicial effect to the defendant. *See* Boyce & Kimball, *Utah Rules of Evidence 1983– Part II,* 1987 Utah L.Rev. 467, 491–97 [hereinafter Boyce & Kimball]. Thus, convictions for crimes not involving dishonesty or false statement cannot be used for impeachment purposes in Utah *unless* they are felony convictions and the trial court has applied the proper balancing test under the rule. *State v. Banner,* 717 P.2d 1325, 1334 (Utah 1986); *State v. Gentry,* 747 P.2d 1032, 1036–37 (Utah 1987). In *Banner,* we set forth factors to be considered

when balancing probative value against prejudicial effect pursuant to rule 609(a)(1):

[1] the nature of the crime, as bearing on the character for veracity of the witness.

[2] the recentness or remoteness of the prior conviction. . . .

[3] the similarity of the prior crime to the charged crime, insofar as a close resemblance may lead the jury to punish the accused as a bad person.

[4] the importance of credibility issues in determining the truth in a prosecution tried without decisive nontestimonial evidence. . . .

[5] the importance of the accused's testimony, as perhaps warranting the exclusion of convictions probative of the accused's character for veracity. . . .

*Banner*, 717 P.2d at 1334; *Gentry*, 747 P.2d at 1037.

In the present case, the trial court made no determination under 609(a)(1) but ruled that defendant's prior convictions were automatically admissible, concluding that "stealing types of crimes are crimes of dishonesty." Thus, we must now determine what is a crime involving "dishonesty or false statement" under rule 609(a)(2). In *Cintron*, we held under the former rule that a misdemeanor theft involved "dishonesty" and might be used to impeach. "But even though the same language is used in the new Rules, there is substantial legislative history behind the federal rule to justify a different result under new rule 609." Boyce & Kimball, 1987 Utah L.Rev. at 493–94. In *Banner*, we stated:

The preliminary committee note to Utah's new Rules of Evidence states that the rules are to provide a fresh starting place for the law of evidence in this state. "Since the advisory committee generally sought to achieve uniformity between Utah's rules and the federal rules, this Court looks to the interpretations of the federal rules by the federal courts to aid in interpreting the Utah rules." Since Rule 609 is the federal rule verbatim, and in light of the construction objectives just noted, we turn to the federal decisions interpreting the rule to aid in deciding this case.

*Banner*, 717 P.2d at 1333–34; *State v. Gray*, 717 P.2d 1313, 1317 (Utah 1986).

The leading federal case interpreting rule 609(a) is *United States v. Smith*, 551 F.2d 348 (D.C.Cir.1976). That case contains a thorough and helpful discussion of the issue we now address. After a review and an analysis of the complete legislative history of rule 609(a), including Congressional debates, the court in *Smith* held that prior convictions for attempted robbery and other related crimes of theft did not fall within the provision of rule 609(a)(2). In so holding, the court supported its position with the Conference Committee Report:

By the phrase "dishonesty and false statement" the Conference means crimes such as perjury or subornation of perjury, false statement, criminal fraud, embezzlement, or false pretense, or any other offense in the nature of crimen falsi, the commission of which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully.

*Smith*, 551 F.2d at 362 (quoting from H.R. Conf.Rep. No. 93–1597, 93d Cong., 2d Sess. 9, *reprinted in* 1974 U.S.Code Cong. & Admin.News 7051, 7098, 7103). The court further stated:

Numerous remarks made in the course of floor debate, set forth in the Appendix to this opinion, substantiate the interpretation that robbery may not be classified legitimately as an "offense in the nature of crimen falsi." Congress clearly intended the phrase to denote a fairly narrow subset of criminal activity. Moreover, research into the derivation of the term "crimen falsi" indicates that Congress's restrictive construction comports with historical practice. While commentators have uncovered some divergence between civil and common law usage, the expression has never been thought to

comprehend robbery or other crimes involving force. Even in its broadest sense, the term "crimen falsi" has encompassed only those crimes characterized by an element of deceit or deliberate interference with a court's ascertainment of truth.

*Smith*, 551 F.2d at 362–63. This interpretation of the words "dishonesty or false statement" is consistent with that adopted by the majority of courts which have had occasion to apply rule 609(a)(2). *Smith*, 551 F.2d at 363, and cases cited therein at pages 363–66.

In ruling that a prior misdemeanor conviction for *petit* larceny was not admissible under rule 609(a)(2), the Third Circuit explained, "Crimen falsi describes crimes involving, or at least relating to, communicative, often verbal dishonesty; we have said that they are 'crimes which touch the question of honesty of the witness.'" *Government of the Virgin Islands v. Toto*, 529 F.2d 278, 281 (3d Cir.1976) (citations omitted). After accepting the Conference Committee Report's formulation of the "crimen falsi" concept, the court agreed that "[p]etit larceny is just not that." *Toto*, 529 F.2d at 281. Following this same rationale, the Ninth Circuit held that shoplifting was not a crime involving dishonesty or false statement under the rule:

> We adopt the views of the Third Circuit in *Toto* because it accords with the expressed intent of the draftsmen of Rule 609, limiting the "dishonesty and false statement" language to those crimes that involve some element of misrepresentation or other indicium of a propensity to lie and excluding those crimes which, bad though they are, do not carry with them a tinge of falsification.
>
> Human experience does not justify an inference that a person will perjure himself from proof that he was guilty of petty shoplifting, as *Toto* recognizes. An absence of respect for the property of others is an undesirable character trait, but it is not an indicium of a propensity toward testimonial dishonesty.

*United States v. Ortega*, 561 F.2d 803, 806 (9th Cir.1977).

McCormick has "maintained that under the view of the Report of the Conference Committee limiting the phrase 'dishonesty or false statement' to crimes involving crimen falsi little meaning attaches to the term 'dishonesty,' with the possible exception of embezzlement." *McCormick on Evidence* § 43 (3d ed.1984, Supp.1987). However, McCormick clearly recognizes:

> The pattern that has emerged from the cases evidences a willingness to follow the Conference Committee's Report and define dishonesty or false statement as a crime "which involves some element of deceit, untruthfulness, or falsification bearing on the accused's propensity to testify truthfully." Several additional crimes have now been held on their face to meet this definition. On the other hand, federal courts and most state courts are unwilling to conclude that offenses such as petty larceny, shoplifting, robbery, and narcotic violations are per se crimes of dishonesty or false statement. A physical attempt to remain undetected does not alone make the crime one involving dishonesty or false statement. However, if the party wishing to employ a conviction not considered per se a crime of dishonesty or false statement is able to show by going behind the judgment that the particular conviction rested upon facts establishing deceit, untruthfulness or falsification, i.e., involved some element of active misrepresentation, the prior conviction may be employed to impeach credibility.

*McCormick* § 43, at 6 (Supp.1987) (citations omitted); *see generally* M. Graham, *Handbook of Federal Evidence* §§ 609, 609.4 (2d ed.1986). In retrospect, Congress could have used language more definitive of the concept it had in mind.

 The prior convictions used in the instant case against defendant were for retail theft and attempted burglary. We agree that ordinarily, such crimes do not

involve dishonesty or false statement within the meaning of rule 609(a)(2) because they do not involve the credibility-deteriorating quality contemplated in the rule. *See State v. Morehouse,* 748 P.2d 217, 222 n. 2 (Utah Ct.App.) (Jackson, J., dissenting), *cert. denied,* 765 P.2d 1278 (Utah 1988). In two later cases, our Court of Appeals agreed. *State v. Brown,* 771 P.2d 1093 (Utah Ct.App.1989); *State v. Wight,* 765 P.2d 12 (Utah Ct.App.1988). "[T]heft is not a crime involving 'dishonesty or false statement' within the meaning of rule 609(a)(2)." *United States v. Yeo,* 739 F.2d 385, 387 (8th Cir.1984). That court reasoned that theft, "which involves stealth and demonstrates a lack of respect for the persons or property of others, is not 'characterized by an element of deceit or deliberate interference with a court's ascertainment of truth.' " *Yeo,* 739 F.2d at 387 (citation omitted). However, a prior conviction for theft may be admissible under the rule "if in fact the crime was committed by fraudulent or deceitful means." *Yeo,* 739 F.2d at 388; *United States v. Glenn,* 667 F.2d 1269, 1273 (9th Cir.1982); *see United States v. Smith,* 551 F.2d at 364 n. 28. In *Glenn,* the court excluded prior convictions for burglary and grand theft because "they do not 'bear *directly* on the likelihood that the defendant will *testify* truthfully.' " *Glenn,* 667 F.2d at 1273 (quoting *United States v. Hayes,* 553 F.2d 824, 827 (2d Cir.), *cert. denied,* 434 U.S. 867, 98 S.Ct. 204, 54 L.Ed.2d 143 (1977) (emphasis in original)). Similarly, a prior shoplifting conviction was excluded under the rule in *United States v. Entrekin,* 624 F.2d 597, 598 (5th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 350 (1981), prior convictions for burglary were excluded in *United States v. Seamster,* 568 F.2d 188, 190–91 (10th Cir. 1978), and prior misdemeanor theft convictions were excluded in *United States v. Papia,* 560 F.2d 827, 846 (7th Cir.1977) (because the crime of larceny or theft is not "encompassed by the strict meaning of the term 'crimen falsi,' an inference arises that Congress intended the term 'dishonesty' in rule 609(a)(2) to mean something more than

a man's propensity to steal what does not belong to him").

We hold that the trial court erroneously admitted defendant's prior convictions under rule 609(a)(2). His stealing-type crimes of retail theft and attempted burglary are not crimes of "dishonesty or false statement" within the meaning of rule 609(a)(2) unless, as discussed, they were committed by fraudulent or deceitful means bearing directly on the accused's likelihood to testify truthfully. There is no evidence of that. Our decision in *State v. Cintron,* decided under former rule 21, must be restricted to interpreting that rule and is not authority for interpreting present rule 609(a).

The standard for reversal in cases involving an erroneous failure to exclude prior convictions is whether absent the error, there was a reasonable likelihood of a more favorable result for the defendant. *State v. Gentry,* 747 P.2d 1032, 1038 (Utah 1987); *State v. Banner,* 717 P.2d 1325, 1335 (Utah 1986) (citing *State v. Fontana,* 680 P.2d 1042, 1048 (Utah 1984)); *see also* Utah R.Crim.P. 30(a); Utah R.Evid. 103(a). Under this standard, a majority of this Court concludes that the erroneous admission of defendant's prior convictions was harmless. It is clear to us that the State presented sufficient evidence and eyewitness testimony to prove that defendant robbed the Corner Mart convenience store. "Erroneous admission of evidence is harmless if there is convincing, properly admitted evidence of all essential elements of the case." *United States v. Baker,* 693 F.2d 183, 189 (D.C.Cir.1982); *see also State v. Scandrett,* 24 Utah 2d 202, 208, 468 P.2d 639, 643 (1970).

Here, the State used the testimony of four eyewitnesses to identify defendant as the person who committed the crime charged. Even though defendant was not positively identified at a police lineup seven weeks after the robbery, one of the eyewitnesses positively identified defendant just minutes after she observed the robbery occur. She identified him by face and by the clothes he was wearing. She also identified the car as the one she saw leav-

ing the vicinity of the crime. Furthermore, the arresting police officers seized from defendant and Otis Latham the approximate amount of money taken from the Corner Mart just a few minutes earlier. The money seized from defendant was tucked down the front of his pants, just as the eyewitnesses testified they had seen him do as he left the store. In addition, defendant testified of his innocence. During direct-examination, defense counsel tactfully elicited the evidence of his prior convictions in order to reduce the prejudicial effect of the evidence if revealed for the first time on cross-examination. The State did not bring up the prior convictions on cross-examination or during its closing argument. Thus, we are not satisfied that defendant's credibility was damaged so as to justify reversal or that absent the error, there was a reasonable likelihood of a more favorable result for him.

### V.

 Finally, given the evidence presented in this case, defendant is entitled to have his conviction reduced from aggravated robbery to robbery for the same reasons another defendant was recently afforded that relief in *State v. Suniville*, 741 P.2d 961 (Utah 1987). There is insufficient evidence to establish that defendant used a firearm or a facsimile thereof, or any deadly weapon, in the course of committing the robbery. Utah Code Ann. § 76–6–302 (1978, Supp.1989). We note that the 1989 amendment to this statute does not apply in the instant case.

Defendant's conviction of aggravated robbery under section 76–6–302 is vacated. The conviction is reduced to robbery, a felony of the second degree under section 76–6–301, and the case is remanded to the trial court for defendant to be resentenced.

HALL, C.J., and STEWART, J., concur.

ZIMMERMAN, Justice: (concurring and dissenting)

I join all of the majority opinion except that part holding the erroneous admission of evidence of three prior convictions to be harmless error. I agree with the State's position and would reverse.

The standard for harmful error is whether there is a reasonable likelihood of a more favorable result for the defendant in the absence of the error. *E.g., State v. Gentry*, 747 P.2d 1032, 1038 (Utah 1987); *State v. Knight*, 734 P.2d 913, 919–20 (Utah 1987). In *Knight*, we discussed the meaning of "a reasonable likelihood." Such a likelihood exists when the reviewing court's confidence in the outcome is eroded; this erosion occurs at some point between a "mere possibility" and a "probability" of a different outcome. *Knight*, 734 P.2d at 920.

In the present case, the State conceded at oral argument that if we found rule 609(a) barred evidence of the three prior theft-type convictions, the trial court's admission of that evidence was harmful error. Utah R.Evid. 609(a). I agree with the State. First, standing alone, proof of the three prior similar crimes presumptively had a strong tendency to suggest to the jury that defendant was guilty of the charged crime. In fact, it is the very power of prior-crimes evidence to produce convictions for bad character that underlies rule 609(a)'s hostility to such evidence. And our recent cases have shown that in this state, we have a very strong aversion to the gratuitous admission of evidence of prior crimes. *See, e.g., State v. James*, 767 P.2d 549, 556–57 (Utah 1989); *State v. Bishop*, 753 P.2d 439, 494–98 (Utah 1988) (Zimmerman, J., concurring, joined by Stewart and Durham, JJ.).

Second, while the improper admission of such powerful evidence might be harmless in some cases, here the State did not have an overwhelming case. As the majority notes, three of the four eyewitnesses could not identify defendant at a subsequent lineup; in fact, two of them picked out another individual. The weaknesses of eyewitness identifications led to our decision in *State v. Long*, 721 P.2d 483 (Utah 1986), mandat-

ing cautionary instructions whenever such identifications are a central issue. In the present case, all the other evidence against defendant was circumstantial. The car in which he was riding at the time of arrest resembled a car that was seen near the robbery but was not directly connected to the robber. It is true that the amount of money found on defendant and his companion approximated the amount taken; however, the bills could not be traced to the robbery. At bottom, then, defendant's conviction depends upon the eyewitnesses' identifications, only one of which was even arguably solid.

Under all the circumstances, I conclude that absent the erroneous admission of the three prior convictions for similar offenses, there was a reasonable likelihood of a result more favorable to defendant. The convictions should be reversed.

DURHAM, J., concurs in the concurring and dissenting opinion of ZIMMERMAN, J.