**STATE of Utah, Plaintiff and Appellee,**

v.

**Francis Preston MITCHELL, Defendant and Appellant.**

No. 860237.

Supreme Court of Utah.

Aug. 30, 1989.

Kenneth R. Brown, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Earl F. Dorius, Salt Lake City, for plaintiff and appellee.

ZIMMERMAN, Justice:

Defendant Francis Preston Mitchell appeals from his conviction of first degree murder, for which he received a life sentence. Utah Code Ann. § 76-5-202(1)(d) (Supp.1989). He makes two claims on appeal: that the trial court erred in admitting into evidence (i) hypnotically enhanced testimony of an eyewitness and (ii) testimony of a telephone operator who overheard him tell an acquaintance, over the telephone, that he had just killed a man. We agree with Mitchell's first claim but reject his second. Because we cannot find the error harmless, we reverse the conviction and remand for a new trial.

On August 4, 1984, around 9:30 p.m., Fred Duncan and his fiancee, Patricia Tyrrell, were lying on the living room floor of the Park City house of Brian Oliver, whom they were visiting, watching television. Oliver was asleep in another room, having taken sleeping pills and medication to relieve some stomach problems. Around 10 p.m., Tyrrell answered the phone, accepted a collect call, and spoke with an agitated man who identified himself as "Tom" and who was quite emphatic about speaking to Oliver. Tyrrell informed the caller that she would not disturb Oliver since he was asleep and had been sick earlier. The caller became more upset and demanded to speak to Oliver. Tyrrell then handed the telephone to Duncan, who repeated the message that Oliver would not be awakened to come to the phone. Duncan hung up the phone and then took it off the hook. He turned off all the lights in the house and locked the doors. Soon after this, an acquaintance of Duncan's drove over to the Oliver house, knocked on the door, and told Duncan that an individual named Tom Greco had called him and requested that he go over to Oliver's house and ask that Duncan put the phone back on the receiver so that he, Greco, could telephone Oliver. Duncan refused to do this, stating as his reason Oliver's need to have an undisturbed sleep. Duncan then returned to the living room floor, where he and Tyrrell lay underneath a blanket and continued to watch television.

At approximately 11 p.m., a man carrying a gun burst through the front door of the house and into the living room. Tyrrell instinctively rolled away from Duncan, jumped up, and escaped out the front door. Tyrrell ran down the street, hid briefly, and then called the police from a nearby house. The police arrived to find that the gunman had fled and that Duncan had been shot in the head and was dead.

Shortly after the shooting, Tyrrell described the killer and the circumstances surrounding the shooting to Frank Bell, the Park City police chief, in only very general terms. She initially described the gunman as a male, approximately six feet tall, of medium build, wearing dark clothes, and carrying a smooth, flat pistol that looked like an automatic in his left hand. She told the police chief that she could give no other details of the man's description, that he had said nothing during their brief encounter, and that as she bolted out the door she heard a pop that she presumed to be the sound of the pistol discharging. Two days later, on August 6, 1984, Tyrrell stated that she screamed "Don't shoot, don't shoot!" when the gunman burst into the room and that with her peripheral vision she saw the gunman pointing the gun at Duncan and exclaiming "You bastard" just before she escaped and heard the gun go off. At that time, Tyrrell indicated that she could not describe any of the facial features of the killer. When asked whether the gunman was wearing a mask, she stated, "I could not see." When asked if she recognized the gunman's voice, she said it was vaguely familiar but not one that she could recognize. She was directly asked about Mitchell: whether she knew who he was and whether he and Duncan had any sort of relationship that could have led to the shooting. Tyrrell stated that she had met Mitchell once about a year and a half earlier and was not familiar with him. In the two months following the shooting, Park City police kept in close contact with Tyrrell and informed her about the progress of the investigation.

In October of 1984, two months after the shooting, Tyrrell underwent a videotaped hypnosis session at the University of California at Los Angeles. She did this on her own and entirely independent of any action on the part of the police in an attempt to improve her memory so that she could identify the gunman who had killed Duncan. By the time of the hypnotic interview, however, she had had more than twenty conversations, both in-person and on the telephone, with the police concerning the crime. She had also been shown a photograph of Mitchell and been told that he was the prime suspect. During the hypnosis session, Tyrrell was able to "remember" for the first time many details about the shooting. She reviewed the videotape of the hypnosis session four or five times before testifying at the preliminary hearing. Her hypnotically enhanced testimony was also admitted into evidence at trial. She testified, inter alia, that the gunman wore a nylon stocking mask over his face when he burst into Oliver's living room on the night of the shooting; that she saw him pull the mask away from his mouth when he uttered "You bastard" just before shooting Duncan, who raised his head up and said "no;" that there was no struggle between the gunman and Duncan; that she was still in the room when the gun was fired directly at Duncan's head from a distance of approximately six to seven inches; and that she realized that it was the gunman who had called earlier that evening demanding to speak to Oliver.

Mitchell was apprehended in October of 1985 and charged with first degree murder under section 76–5–202(1)(d) of the Code. Utah Code Ann. § 76–5–202(1)(d) (Supp. 1989).[1] The State's theory at trial was that Mitchell intentionally shot and killed Duncan while in the process of committing or attempting to commit a burglary[2] or aggravated burglary.[3] Mitchell testified at trial and admitted shooting Duncan, but claimed that the shooting was accidental. The case was submitted to the jury on instructions that would have permitted it to find Mitchell guilty of first degree or second degree murder or manslaughter. He was convicted of first degree murder.

Mitchell raises the same claims on appeal that he made below. He first claims that the trial court erred in allowing Tyrrell to testify to matters that she "remembered" only after undergoing hypnosis. He argues that hypnotically enhanced testimony should not be admissible as evidence because it is inherently unreliable. The State, on the other hand, contends that any questions about the reliability of hypnotically enhanced testimony should go to its weight, not to its admissibility.

In reviewing a challenge to a trial court's ruling on the admissibility of evidence, we will not disturb the ruling unless it clearly appears that it was in error. *State v. Gray*, 717 P.2d 1313, 1316 (Utah

1. Section 76–5–202 of the Code, entitled "Murder in the first degree," provides in pertinent part:

(1) Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances:

. . . .

(d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, . . . aggravated burglary, burglary. . . .

Utah Code Ann. § 76–5–202(1)(d) (Supp.1989).

2. Section 76–6–202(1) of the Code provides: "A person is guilty of burglary if he enters or remains unlawfully in a building or any portion of a building with intent to commit a felony or theft or commit an assault on any person." Utah Code Ann. § 76–6–202(1) (1978).

3. Section 76–6–203 of the Code provides:

(1) A person is guilty of aggravated burglary if in attempting, committing, or fleeing from a burglary, the actor or another participant in the crime:

(a) Causes physical injury to any person who is not a participant in the crime; or

(b) Uses or threatens the immediate use of a dangerous or deadly weapon against any person who is not a participant in the crime; or

(c) Is armed with a deadly weapon or possesses or attempts to use any explosive or deadly weapon.

(2) Aggravated burglary is a felony of the first degree.

Utah Code Ann. § 76–6–203 (1978) (amended 1988 & 1989).

1986); *State v. Gallegos,* 712 P.2d 207, 208–09 (Utah 1985). No lengthy analysis is necessary to decide whether the trial court erred in admitting Tyrrell's hypnotically enhanced testimony. In *State v. Tuttle,* 780 P.2d 1203 (1989), we determined that hypnotically enhanced testimony is inherently unreliable and inadmissible as evidence. Therefore, we conclude that the trial court erred in admitting Tyrrell's testimony of details surrounding the shooting that she "remembered" only after undergoing hypnosis.[4]

■ The next question is whether the trial court's error in admitting Tyrrell's hypnotically enhanced testimony requires reversal of Mitchell's conviction. Under Utah Rule of Criminal Procedure 30,[5] an error requires reversal only if we conclude that absent the error, there was a reasonable likelihood of a result more favorable to the accused. *State v. Rimmasch,* 775 P.2d 388 (May 1989); *State v. Tuttle,* 780 P.2d at 1213 n. 12; *State v. Verde,* 770 P.2d 116, 121 (Utah 1989); *State v. Bell,* 770 P.2d 100, 105–07 (Utah 1988). A reasonable likelihood of a more favorable outcome exists if our confidence in the verdict is undermined. *State v. Knight,* 734 P.2d 913, 920 (Utah 1987). In the present case, the question becomes whether, in the absence of Tyrrell's hypnotically enhanced testimony, there was a reasonable likelihood of a more favorable result for Mitchell.

■ There is no doubt that Mitchell killed Duncan; he admitted it at trial. The "more favorable result" for Mitchell that might have been obtained absent the erroneous admission of Tyrrell's hypnotically

enhanced testimony would not, therefore, have been one of exoneration. However, the jury might have convicted Mitchell of less than first degree murder. It was instructed that it could convict on the lesser included offenses of second degree murder, manslaughter, negligent homicide, or aggravated burglary if it concluded that the State had failed to prove beyond a reasonable doubt that Mitchell committed first degree murder. To determine whether there was a "reasonable likelihood" of conviction on a lesser included offense absent admission of the hypnotically enhanced testimony, it will be necessary to review the first degree murder charge against Mitchell, his trial testimony, and the prosecutor's use of Tyrrell's hypnotically enhanced testimony.

Mitchell was charged with first degree murder under section 76–5–202(1)(d) of the Code. Utah Code Ann. § 76–5–202(1)(d) (Supp.1989). Specifically, he was charged with intentionally or knowingly killing Duncan while in the commission or attempted commission of a burglary or aggravated burglary. As the prosecutor emphasized throughout trial, in order to convict Mitchell of this charge, it was necessary for the jury to find that he unlawfully entered Brian Oliver's house with the intent to commit an assault or felony on a person and that he intentionally or knowingly killed Duncan. It is clear from the jury verdict that it understood this requirement. The verdict stated: "We the jury of peers in the case of Francis Preston Mitchell find him guilty as charged as directed in 'Instruction's [sic] to the Jury' i.e., 'Instruction No. 1' and 'Instruction No. 13.'"[6]

4. Mitchell made a pretrial motion to suppress the hypnotically enhanced testimony; it was denied. He did not state a specific objection to this testimony when it was introduced at trial. Utah Rule of Evidence 103(a) requires a timely and specific objection to preserve an evidentiary error for appeal. Utah R.Evid. 103(a). However, in *State v. Johnson,* 748 P.2d 1069, 1071–72 (Utah 1987), this Court held that a defendant is not required to object or renew his or her objection at trial to preserve the issue for appeal when the trial judge is the same one who ruled on the pretrial motion and where the record or transcript indicates that a hearing on the motion was held. Because both of the *Johnson*

requirements exist in this case, Mitchell's claim of error was preserved for appeal.

5. Utah Rule of Criminal Procedure 30 states: "Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded." Utah R.Crim.P. 30 (codified at Utah Code Ann. § 77–35–30 (1982), repealed effective July 1, 1990).

6. Instruction No. 1 repeated the first degree murder charge as it appeared in the information. Instruction No. 13 stated in pertinent part:

As was mentioned earlier, Mitchell admitted to breaking into Oliver's house and shooting Duncan on August 4, 1984. Also, several witnesses testified at trial that he told them he killed Duncan. However, Mitchell specifically denied that he intended to assault anyone inside the house, let alone kill Duncan. In support of this, he testified to the following: During the week prior to August 4, 1984, he became aware that his good friend Greg Oliver, Brian Oliver's son, had been involved in a drug deal that had "gone sour" and that as a result, there was a strong possibility that Greg Oliver would be harmed. He talked to Brian Oliver about his concern on the telephone around 4 p.m. on August 4th. That evening, he received additional information that made him even more concerned for Greg Oliver's safety. While at a concert at the Salt Palace, he asked a friend to call Brian Oliver and tell him to warn his son that a warrant had been issued for his arrest. Mitchell testified that he thought this information would presumably cause Greg Oliver to flee, thus making him safe from danger. When Mitchell learned from his friend that Duncan would not let any phone calls through to Brian Oliver, he decided to go to Park City himself to warn and possibly protect Greg Oliver.

Mitchell testified that he obtained a weapon and took a taxi to Greg Oliver's residence in Park City. Oliver was not home. Mitchell then went to Brian Oliver's house, a few blocks away. Upon arriving, he noticed that the lights were out and the place was quiet, something Mitchell thought was highly unusual for a Saturday night. He went around to the bedroom window and saw Brian Oliver sprawled on the bed, but was unable to awaken him by tapping on the window. He then circled around to the front of the house and, looking in the front bay window, noticed two forms on the floor. He was not sure whether they were attempting to hide or were injured. The television was on and seemed inordinately loud. He thought he detected movement in the dining room and decided that he should enter the premises to see what was going on. He took out the gun, kicked open the door, and burst into the living room on his way to the dining room area. When he did so, he immediately tripped on something, stumbled, and fell. The gun accidentally discharged, killing Duncan. Mitchell said he panicked and fled the crime scene. Fearing that no one would believe the shooting was an accident, he fled the jurisdiction a few days later.

The prosecutor's theory of the killing was that Mitchell murdered Duncan because of personal animosity and because Mitchell believed Duncan was a rival cocaine dealer who was starting to infringe on his trade. While these factors certainly could provide a motive for the killing, such a motive alone would not necessarily convince the jury that Mitchell's version of the killing was not true and that Mitchell had entered the premises with an intention to commit a felony and had intentionally or knowingly killed Duncan. Accordingly, evidence supporting the theory that the shooting was intentional, rather than accidental, was critical to the State's case. There was virtually nothing in Tyrrell's statements given to police before the hypnosis session that conflicted with Mitchell's

Before you can convict the Defendant, Francis Preston Mitchell, of the crime of Criminal Homicide, Murder in the First Degree, you must find from the evidence beyond a reasonable doubt, all of the following elements of the crime:
. . . .
2. That the defendant, Francis Preston Mitchell, entered the dwelling of Brian Oliver with the intent to commit a felony or assault on any person;
3. That while remaining unlawfully in the dwelling of Brian Oliver, the defendant, Francis Preston Mitchell caused the death of Fred Duncan;

4. That such death was intentionally or knowingly caused by the defendant, Francis Preston Mitchell;
. . . .
If you believe that the evidence establishes each and all of the essential elements of the offense beyond a reasonable doubt, it is your duty to find the defendant guilty of Criminal Homicide—Murder in the First Degree. On the other hand, if the evidence has failed to so establish one or more of the said elements, then it is your duty to find the defendant not guilty of Criminal Homicide—Murder in the First Degree.

version of events. However, Tyrrell's statement, made only after hypnosis, that Mitchell wore a nylon stocking mask when he burst into the house and that he pulled the mask away from his mouth to utter "You bastard" before shooting Duncan was entirely consistent with the State's theory and inconsistent with Mitchell's version of events. The prosecutor, therefore, emphasized throughout the trial that Mitchell wore a mask on the night of the crime.

In its opening statement, the prosecutor referred to the mask in describing the shooting:

> The man burst into the living room. Patty Tyrell, [sic] who's covered with an afghan, throws the afghan off and jumps up and yells "Don't shoot, don't shoot" because she sees the Defendant with a gun in his hand. The Defendant virtually ignores Patricia Tyrell, [sic] goes over in front of Fred Duncan, takes that weapon, *pulls a mask type apparatus from his mouth,* says "You bastard", [sic] and shoots him through the head with a single shot.

(Emphasis added.) During cross-examination of Mitchell, the prosecutor asked, "How come you wore a mask when you went into the home?" In its closing statement, the prosecutor referred again to the mask. While discussing which of the witnesses to believe, the prosecutor stated:

> Then we have the part of Patty Tyrell's [sic] testimony where she told you that *the person who kicked open the door was wearing a mask.* And according to the Defendant, he wasn't wearing a mask. Either Patty Tyrell [sic] is lying or the Defendant is lying.
>
> Patty Tyrell [sic] said that *he pulled the mask away from his face,* and then said the words "You bastard."
>
> Why would a person want to wear a mask? *A person would wear a mask if he wants to prevent people from seeing who he is,* trying to disguise his appearance. Someone is lying.
>
> Then we have further testimony from Patty Tyrell [sic] that the Defendant *after he pulled that covering from his mouth* said the words "You bastard."

> The Defendant says he didn't say those words. Either Patty Tyrell [sic] is lying or the Defendant is lying.

(Emphasis added.) In attempting to refute defense counsel's closing argument that Mitchell's actions on the night of the shooting were inconsistent with an intentional killing, the prosecutor stated in part:

> Why did he leave a witness? Mr. Mitchell hardly knew Patty Tyrell, [sic] had met her one time a couple of years before the shooting. He didn't have any animosity towards Patty Tyrell [sic]. She wasn't getting involved in his business. *And most important of all, he thought that because he hadn't seen her for those two years, because he had a mask, he could get away with the crime.* Unfortunately, Patty Tyrell [sic] was able to identify him eventually.

(Emphasis added.) Finally, in summing up its argument, the prosecutor returned to its theme that either Mitchell or the other witnesses were lying and again referred to the mask: "Mr. Brown says you don't have to believe Patty Tyrell [sic] or Preston Mitchell [is] lying. Their testimony is consistent with each other. Garbage. *Mask,* the statement you bastard, no struggle, no physical contact before the shot, they are not consistent at all." (Emphasis added.)

What Tyrrell "recalled" only after hypnosis was not the only evidence supporting the prosecutor's theory that Mitchell intentionally killed Duncan, but it was the most persuasive and the most emphasized. As discussed earlier, the admission of this testimony was error. We conclude that absent the hypnotically enhanced testimony, there was a reasonable likelihood that the outcome would have been more favorable for Mitchell, i.e., he might have been convicted of second degree murder or some other lesser included offense. Therefore, we conclude that the admission of Tyrrell's hypnotically enhanced testimony constituted harmful error. Mitchell's conviction is reversed and this case remanded for a new trial.

We wish to emphasize that our decision to reverse Mitchell's conviction and remand the matter for further proceedings is based

on our determination that absent the erroneous admission of the hypnotically enhanced testimony, there was a reasonable likelihood that Mitchell might have obtained a more favorable result at trial, i.e., by being convicted of an offense other than first degree murder. We agree with the observation in Chief Justice Hall's dissenting opinion that apart from the improperly admitted hypnotically enhanced testimony, there was sufficient evidence to support a first degree murder conviction. However, that is not the standard by which harmless error determinations are to be made. Rather, the reviewing court is to decide whether, considering all the evidence, there was a reasonable likelihood that the jury would have decided the case differently. *State v. Knight*, 734 P.2d 913, 919–20 (Utah 1987). If such a likelihood exists, defendant is entitled to have a jury consider the case anew, free from the taint of the inadmissible evidence. The reasonable likelihood question is not just the substantial evidence test in disguise; rather, it focuses on the taint caused by the error. If the taint is sufficient, it is irrelevant that there is sufficient untainted evidence to support a verdict. Any stricter interpretation of harmful error, such as the one seemingly employed by the Chief Justice here, runs the risk of substituting our judgment for that of the jury and could be criticized as encouraging the improper admission of evidence by de facto weakening the sanctions against it. *See* Comment, *Harmless Error: Abettor of Courtroom Misconduct*, 74 J.Crim.L. & Criminology 457 (1983).

■ Mitchell's second argument on appeal is that the trial court erred in admitting the testimony of an AT & T operator who overheard a telephone conversation between Mitchell and a friend that occurred shortly after the killing. Mitchell also claims that the court erred in admitting the testimony of the individual he called. Both statements differed somewhat from Mitchell's version of the telephone call. We consider this argument because the issue is likely to re-emerge on retrial.

Mitchell testified that after the shooting at Oliver's house, he fled on foot from Park City to Park West, approximately three miles away. Somewhere in the course of his flight, he decided to call a friend, Sean Sears, who lived in Miami, Florida, and get some advice as to what he should do. Mitchell went to the Red Pine Condominiums in Park West and used the pay phone at the check-in counter. At trial, Mitchell recalled that in what he described as a "pretty incoherent" state, he placed a collect call to Sean Sears. As soon as Sears answered the phone, Mitchell said, "This is Preston. There is an accident." After Sears responded by asking him something like "are you ripped?" Mitchell blurted out, "I killed somebody. What do I do?"

The telephone operator testified that shortly after 2 a.m. on August 5th, she handled a collect call from a coin telephone in the Park City area. The man who placed the call said his name was Preston and that there was an emergency that involved a car accident. The operator recalled that when the telephone was answered, she announced the collect call from Preston. After the call was accepted, she pushed the release button to disconnect herself from the transmission in order to begin timing the call for billing purposes and started to read a book she brought to work. As she was doing this, she heard Mitchell's initial remark to Sears. She testified that she heard Mitchell say, "There had been an accident, a man tried to rip my [sic] off. He had a gun, and I killed him."

Sean Sears was subpoenaed by the prosecutor and he also testified at Mitchell's trial. Under direct examination, he first said he was aware that Mitchell owned a .45-caliber pistol similar to the one involved in the shooting of Duncan. He was not specific in stating what Mitchell had said during the telephone conversation, but he testified that Mitchell called him in the early morning hours of August 5th, and "[t]o the best of my knowledge he said he had blown away someone."

Mitchell argues that the trial court erred in admitting into evidence the testimony of both the telephone operator and Sean Sears. He claims that the operator intercepted his conversation in violation of sec-

tion 77–23a–2(4) of the Code and, therefore, all evidence related to or flowing from the intercept should have been suppressed pursuant to section 77–23a–7 of the Code, which provides for the exclusion of illegal intercepts or evidence that has been derived from such intercepts.[7]

The State responds to this claim by contending that Mitchell's statement, as well as the other evidence derived from the statement, was lawfully obtained and, therefore, properly admitted at trial. Section 77–23a–9(3) of the Code provides that information resulting from an intercept can be admitted in judicial proceedings if it was obtained as a result of an intercept conducted in accordance with the provisions of the Code. Utah Code Ann. § 77–23a–9(3) (1982).

The State suggests two grounds for finding that the intercept was not conducted in violation of the Code. First, the State argues that the operator's overhearing Mitchell was only inadvertent and, therefore, not the intentional "intercept" proscribed by section 77–23a–2(4) of the Code. Alternatively, the State argues that even if the operator's overhearing Mitchell was an intercept, it was lawful because the Code makes lawful intercepts that occur when a switchboard operator is "engaged in any activity which is a necessary incident to the rendition of [the telephone] service." [8] Utah Code Ann. § 77–23a–4(2)(a)(i) (1982). The operator was in the act of pushing the release button to disconnect herself from Mitchell's call when she overheard him. The State argues that this is an activity "which is a necessary incident to the rendition of [the telephone] service."

7. Chapter 23a of title 77 of the Code, entitled "Interception of Communications," was extensively amended and supplemented in 1988 and 1989. 1988 Utah Laws ch. 251, §§ 2–14; 1989 Utah Laws ch. 122, §§ 1–7. All provisions pertinent to Mitchell's second argument on appeal were either not changed by the amendments or only stylistically modified.

8. Section 77–23a–4(2)(a)(i) provides:
*It shall be lawful under this chapter for an operator of a switchboard,* or an officer, employee, or agent of any communication common carrier, *whose facilities are used in the*

Because the correctness of the trial court's ruling here hinges on the terms of section 77–23a–4 of the Code, we accord the trial court's legal conclusion no particular deference on review and instead appraise it for correctness. *Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985).

Although the issue is not entirely free from doubt, our reading of the statute as a whole suggests that the State's first argument is correct; to wit, the statute is not designed to exclude from evidence or otherwise penalize inadvertent overhearings such as occurred here. Rather, the statute's aim is to prohibit intentional surveillance activities in the absence of a court order. Indicative of this is the text of section 77–23a–2(4) of the Code:

To safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communication has consented to the interception should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court. Interception of wire and oral communications should further be limited to certain major types of offenses and specific categories of crime with assurance that the interception is justified and that the information obtained thereby will not be misused.

Utah Code Ann. § 77–23a–2(4) (1982). We therefore conclude that the inadvertent overhearing was not an "intercept," as that term is used in section 77–23a–3(4), and that section 77–23a–7 does not preclude its admission. Mitchell simply started talking before the operator could get off the line. Her overhearing Mitchell's statement that

*transmission of a wire communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service* or to the protection of the rights or property of the carrier of the communication, and the communication common carriers shall not utilize service observing or random monitoring except for mechanical or service quality control checks.
Utah Code Ann. § 77–23a–4(2)(a)(i) (1982) (emphasis added).

he killed a man was purely accidental. Decisions from other jurisdictions that reject challenges to admission of incriminating statements inadvertently overheard by telephone operators or other persons support our conclusion. *See United States v. Ross*, 713 F.2d 389 (8th Cir.1983); *United States v. Axselle*, 604 F.2d 1330 (10th Cir.1979); *United States v. Savage*, 564 F.2d 728 (5th Cir.1977); *Roberts v. State*, 453 P.2d 898 (Alaska 1969), *cert. denied*, 396 U.S. 1022, 90 S.Ct. 594, 24 L.Ed.2d 515 (1970); *State ex rel. Flournoy v. Wren*, 108 Ariz. 356, 498 P.2d 444 (1972); *Koza v. State*, 100 Nev. 245, 681 P.2d 44 (1984); *People v. Sierra*, 74 Misc.2d 332, 343 N.Y.S.2d 196 (1973).

Mitchell's conviction is reversed, and the matter is remanded for a new trial.

STEWART and DURHAM, JJ., concur.

HALL, Chief Justice (dissenting):

I do not join the Court in reversing the conviction because I am not persuaded that introduction of the hypnotically enhanced testimony constituted other than harmless error.

The verdict is supported by substantial credible evidence, wholly independent of whether defendant was wearing a mask. The undisputed fact that defendant broke into the house unannounced with a gun in his hand, coupled with the evidence that Tyrell screamed, "Don't shoot, don't shoot!" and that she saw defendant point the gun at Duncan while exclaiming, "You bastard," sufficiently supports the verdict and the conclusion that this error was harmless. Particularly is this so in light of (1) defendant's tenuous explanation of the event, that he stumbled, fell, and in some way accidentally shot Duncan in the head, (2) defendant's suspect explanation of why he secreted the murder weapon and went into hiding, and (3) the long distance opera-

tor's testimony that she overheard defendant say that someone had tried to·rip him off and that defendant had killed that person.

In light of all of the facts and circumstances adduced at trial, I am not persuaded that, absent the error, there is any reasonable likelihood that defendant might have obtained a more favorable verdict.[1] Nor am I persuaded that the error was sufficient to undermine confidence in the verdict.[2] I would affirm.

Finally, it must be noted that notwithstanding indications in the main opinion to the contrary, my analysis of the admission of this testimony utilizes the identical harmless error test the Court has previously established and consistently employed. The issue of whether the erroneous admission of evidence amounts to harmless or prejudicial error in any particular case cannot be decided in a vacuum. Instead, in order to determine whether the error is so substantial and prejudicial that in its absence there is a reasonable likelihood of a more favorable result for the defendant,[3] it is imperative to weigh factors such as the nature, extent, posture, substance, credibility, sufficiency and impact of the evidence properly admitted. In doing so, it is necessary to review the error-free evidence in the light most favorable to the jury's verdict.

Most recently in *State v. Bruce*,[4] we applied this established harmless error test by reviewing the error-free evidence in the light most favorable to the jury's verdict and then concluded that "[i]t is clear to us that the State presented sufficient evidence and eyewitness testimony to prove that defendant robbed the ... convenience store. 'Erroneous admission of evidence is harmless if there is convincing, properly admitted evidence of all essential elements of the case.' "[5]

---

1. Utah R.Crim.P. 30.

2. *State v. Knight*, 734 P.2d 913, 920 (Utah 1987).

3. *State v. Johnson*, 771 P.2d 1071, 1073 (Utah 1989).

4. 779 P.2d 646, 655–656 (Utah 1989).

5. *Id.* (quoting *United States v. Baker*, 693 F.2d 183, 189 (D.C.Cir.1982), and citing *State v. Scandrett*, 468 P.2d 639, 643 (1970)).

This is the harmless error standard I have utilized and the Court has consistently employed.[6]  Contrary to the view expressed in the main opinion, it has not and does not "encourag[e] the improper admission of evidence by de facto weakening the sanctions against it."[7]  In fact, it is only through the continued use of this standard that we actually avoid "substituting our judgment for that of the jury."[8]

HOWE, Associate C.J., concurs in the dissenting opinion of HALL, C.J.

**6.** *See, e.g.,   State v. Johnson,* No. 870096, 115 Utah Adv.Rep. 6, 10–11, slip op. at 5, 11–12 (Utah August 17, 1989) (all circumstances of case considered in harmless error analysis); *Bruce,* 779 P.2d at 656 (error was harmless in view of fact that state presented sufficient evidence of essential elements of case); *State v. Tuttle,* 780 P.2d 1203, 1213–1214, (1989) ("Whether an error in the admission of [hypnotically enhanced] testimony offered by the State or in the exclusion of testimony [on the reliability of that evidence] offered by the accused is harmless under [the federal constitutional harmless error] standard depends on many factors.  Those factors include the importance of the witness's testimony, whether the testimony was cumulative, whether the testimony was corroborated or contradicted, and the overall strength of the State's case." (citations omitted); analysis of quoted factors leads to conclusion that errors were harmless

beyond reasonable doubt) *comparing Robison v. State,* 677 P.2d 1080, 1085 (Okla.Crim.App.) ("erroneous admission of post-hypnotic identification was harmless because the other evidence, although circumstantial, was overwhelming"), *cert. denied,* 467 U.S. 1246, 104 S.Ct. 3524, 82 L.Ed.2d 831 (1984) *with Harmon v. State,* 700 P.2d 212, 214, 216–17 (Okla.Crim.App.1985) ("erroneous admission of post-hypnotic identification was not harmless beyond a reasonable doubt because the only other evidence against [the defendant] was inconclusive hair evidence and two reports of damaging admissions"), *petition for reh'g pending; State v. Tillman,* 750 P.2d 546, 555 (Utah 1987) (alleged constitutional error found harmless in face of overwhelming evidence of defendant's guilt, isolated nature of error, and trial judge's instruction).

